# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-01240-SCT

*JOSEPH COOK*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/11/2013 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| TRIAL COURT ATTORNEYS: | JOHN R. McNEAL, JR. |
| | VICKY F. WILLIAMS |
| | JACQUELINE LANDES PURNELL |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHN R. McNEAL, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MELANIE DOTSON THOMAS |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/23/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., KITCHENS AND COLEMAN, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1. Joe Cook was convicted in the Rankin County Circuit Court for two counts of sexual battery on his girlfriend's daughter and for one count of directing or causing a felony to be committed by the girlfriend's son. The evidence established that, with his penis and fingers, Cook penetrated the vagina of ten-year-old S.J. and forced her brother, nine-year-old H.L., to have sexual relations with his sister. Cook was sentenced as an habitual offender to a life sentence for each of the two sexual battery counts and to twenty years for the single count

of causing a felony to be committed by a minor. The three sentences were made to run concurrently. Cook claims on appeal that the children's statements to a Sexual Assault Nurse Examiner (SANE) constituted inadmissible hearsay, that the children's statements to their great-grandmother and to a forensic interviewer constituted inadmissible hearsay, and that the trial court erred by sentencing him as an habitual offender. Finding that Cook's assignments of error are without merit, we affirm his convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2.     Joe Cook was indicted on August 28, 2012, for two counts (Counts I and II) of sexual battery in violation of Mississippi Code Section 97-3-95(1)(d) (Rev. 2014) and for one count (Count III) of directing or causing a felony to be committed by a person under the age of seventeen years in violation of Mississippi Code Section 97-1-6 (Rev. 2014). Prior to trial, on March 19, 2013, the State moved to amend Cook's indictment to charge him as an habitual offender pursuant to Mississippi Code Section 99-19-81 (Rev. 2007), over the objection of Cook's attorney. The trial court granted the State's motion and amended Cook's indictment on March 26, 2013, thirteen days before the commencement of trial on April 8, 2013.

¶3.     At the time of the alleged crimes, S.J.[1] lived with her mother, her brother, H.L., and Joe Cook, her mother's boyfriend, in Rankin County, Mississippi. S.J. testified that, on

---

[1]At Cook's trial in April 2013, S.J. testified that she then was eleven years of age and that her birthday was May 10.

March 3, 2012, Cook, along with S.J. and H.L.,[2] drove the children's mother to work. After going to Cook's sister's house, Cook, S.J., and H.L. returned home to the trailer they shared with the children's mother. According to S.J., Cook "asked us if we wanted to have some fun," but we "didn't know what it meant." In the living room of the trailer, Cook produced his cellular phone and proceeded to show "sex videos" to S.J. and H.L., which depicted people "[h]aving sex." S.J. testified that she, H.L., and Cook then went into the back bedroom shared by Cook and the children's mother. Cook "showed us sex toys," including one "bullet," a black, "round metal piece with a wire to it." Cook also showed the children images of sex toys on his cellular phone. According to S.J., Cook explained that the sex toys were used "[t]o make you feel good." S.J. testified that Cook then removed his trousers, placed a condom on his penis, and "put his private part way in me." Additionally, S.J. testified that Cook touched her with his finger "[o]n the outside and part way in" and told her that she "had a pretty private." According to S.J., Cook "wanted my brother and me to have sex," so H.L. got on top of S.J. and H.L.'s private touched S.J.'s private. S.J. testified that Cook threatened to poison S.J. and H.L. and then made them take a bath and put on different clothes before they went to pick up the children's mother from work.

¶4.    H.L. told a similar story at trial: he stated that Cook showed H.L. and S.J. videos which depicted "nasty stuff" involving people with no clothes on. According to H.L., Cook and S.J. went into the bedroom "and talked." H.L. then went into the bedroom and observed Cook placing "his thing inside my sister." H.L. "thought I was going to throw up" and went

_____

[2] At Cook's trial in April 2013, H.L. testified that he then was ten years of age and that his date of birth was February 7, 2003.

3

to the bathroom. When H.L. returned to the bedroom, Cook "told me to do some things to my sister that I didn't want to do." H.L. responded in the negative when asked whether he had touched his private to S.J.'s private, but stated that he did touch S.J. "where her nasty thing is." H.L. testified that Cook threatened that if he or S.J. told anyone, Cook "would kill us."

¶5.     S.J. testified that she told her mother the day after Cook allegedly had abused her; H.L. testified that he told his mother "[r]ight after Joe Cook went to sleep" because of Cook's threats. Cook continued to live in the mother's residence "for a while." The mother testified that her children had told her of the alleged abuse, that they were "nervous and scared," and that she had confronted Cook. Cook responded that "he had caught the children having sexual acts with each other" and that he "took care of it." According to the mother, Cook stated that "he wanted an open family," that "he wanted us to talk with the kids about sex so they would know more." Specifically, Cook stated that he wanted S.J. and H.L. to observe Cook and their mother having sexual relations "just to know about the birds-and-the-bees . . . ." While she "didn't agree" with Cook's proposal "at all," she remained with Cook for "financial reasons" because she was "seven months pregnant about to go on maternity leave." The mother testified that Cook did not keep the children alone after the alleged abuse.

¶6.     The great-grandmother of S.J. and H.L. and grandmother of their mother testified that S.J. and H.L. visited her house on a daily basis and that the mother's trailer is situated "across from my driveway" in Rankin County. The great-grandmother testified that one afternoon, S.J. requested that she (whom S.J. referred to as "Granny") come into the bathroom. S.J.

4

proceeded to ask Granny whether a stain in her pants was blood, whereupon Granny responded that "if you notice any more, we'll take care of it . . . ." According to Granny, a few days later, S.J. again called her into the bathroom, that S.J. was "very upset," and that S.J. told Granny "that Joe had raped her." The great-grandmother testified that she promised S.J. not to tell anyone and, after about two or three days, "told my daughter [the mother's mother] something had happened that needed to be addressed." This woman—the grandmother[3] of S.J. and H.L.—testified that, after her conversation with Granny, she walked next door to the trailer of the children's mother to discuss the situation and that "[w]e agreed to go to the police department and file a report." The mother and the grandmother reported Cook's conduct with the children to the local police on April 23, 2012.

¶7. The day after the incident had been reported to the police, a detective was assigned to the case. The detective, according to his department's standard protocol, set up interviews for S.J. and H.L. with a forensic interview specialist with the Child Education Center (CEC) in Madison, Mississippi. The interviewer[4] testified that she interviewed S.J. on May 14, 2012, and that she interviewed H.L. on May 18, 2012. On cross examination, the interviewer stated that her "training qualifies me to follow the protocol to make sure the interview is given consistently so that there can be—it can be shown whether it was a credible or

---

[3]At the time of trial, in April 2013, S.J., H.L., and their mother were living with the children's maternal grandmother at her home. The children's mother testified that she lost custody of S.J. and H.L. because she violated the no-contact order by taking S.J. "around Joe."

[4]The interviewer was not tendered as an expert witness, nor did she purport to offer expert testimony.

incredible interview." Also during cross examination, she stated that she is "not qualified to say" whether S.J. "was or was not abused," but could only testify that "[i]t was a credible interview."

¶8.     While S.J. disclosed to the interviewer that Cook had abused her, H.L. did not. The interviewer explained that H.L. "was extremely nervous and uncomfortable to the point that I asked him if he would be more comfortable with a male interviewer." The first interviewer, a woman, left the room and sent in a male interviewer to whom H.L. disclosed no abuse. On the basis of the interview with the children, the female interviewer recommended that the law enforcement investigation continue, that Mississippi Department of Human Services "ensure a safety plan for a child," that Catholic Charities conduct therapy, that a "child abuse medical exam" be conducted, and that the children have no contact with Cook.

¶9.     A family nurse practitioner at the Mississippi Children's Justice Center of the University of Mississippi Medical Center (UMMC) who had been trained as a Sexual Assault Nurse Examiner (SANE) was tendered by the State and accepted by the trial court as an expert pediatric forensic nurse examiner. This witness testified that the Children's Justice Center (CJC) is "a medical entity within UMC" which takes "pediatric patients who are suspected victims of child physical or sexual abuse and neglect." She testified that she first obtains a history both from the patient and from the patient's guardian "or whoever brings them," taking into "account the previous medical record." According to this witness, "I talk to the patient themselves about why they're there." Following that discussion, she conducts a medical examination of the patient, including "a full head-to-toe checkup with forensic

photography so it documents everything on the child that day, including anal/genital anatomy." The medical examination includes "lab work while the children are there, depending on what they tell us, to include testing for HIV and syphilis; often testing for gonorrhea and chlamydia, depending on the allegations."

¶10. She went on to testify that she saw S.J. on May 2, 2012, that S.J. was ten years of age at that time, and that S.J. had been referred to the CJC by the UMMC "pediatric emergency room where she had been seen a couple of weeks prior." She testified that she also saw H.L. on July 24, 2012. According to the nurse practitioner, both S.J. and H.L. disclosed to her that Cook had abused them. The medical examinations of S.J. and H.L. revealed no physical injuries. The witness explained that she would not have expected to find injuries fifty days after the assault was alleged to have occurred. Moreover, she noted there is a "common misconception that penetration causes trauma to the hymen, that the hymen is a membrane, a sheet that has to be broken with the first penetration, and that's not true." Instead, according to her, because "estrogen aids in thickening the hymen and softening the hymen," for a child whose hymen has become estrogenized, signaling the beginning of puberty, trauma may not be evident. She had noted on S.J.'s records that S.J.'s hymen was estrogenized.

¶11. The nurse practitioner asserted that her main purpose in evaluating S.J. and H.L. was to ensure that they were physically healthy. But, while no medical treatment was required for S.J. "because her exam was normal," she opined that "[r]eferrals to psychological counselors is part of what we do." More specifically, she said, "[a]ll of our children who come in with allegations of suspected, even physical abuse but for sure sexual abuse, it's our general

7

protocol to refer them for counseling." She testified that she had diagnosed both S.J. and H.L. with child sexual abuse and recommended counseling. The witness said that she did not observe any psychological problems with S.J. and H.L. related to the alleged abuse at the time of their respective examinations.[5] According to her, with regard to S.J., "[g]iven what she had told me, I felt that she needed further evaluation for potential posttraumatic stress disorder and other things that happen when children have been sexually abused."

¶12.     Following the denial of Cook's motion for directed verdict, Cook called three witnesses in his defense. First, he called a physician, who was tendered and accepted as an expert witness in the field of family medicine. The doctor testified that, "considering a 10-year-old child and an adult male," he would expect to find "significant trauma" to the hymen, "where the hymen has actually been torn or ripped and scars had begun to form." He stated that, regardless of the time between the alleged abuse  and the medical examination, the impact of the adult male's penile penetration of the vagina of a female child would be evident: the hymen "will not grow back together. Once the hymen is torn the scarring is eviden[t]. Now when I say it will not go back together, you may have some reattachment of the tissue, but it will not be a normal hymen. You'll be able to see where it was torn." This expert further opined that tearing the hymen is also possible without sexual penetration: "there's been many cases of torn hymens from things like simply riding a horse or a fall on a staircase or gymnastics . . . ."

---

[5]Although the nurse practitioner did note that H.L. experienced "some issues with previous behavior, some ADHD, some oppositional-type behavers [sic] and aggression" which she "felt would be better evaluated by a child psychologist."

¶13. Cook also called his sister, who testified that, on March 3, 2012, Cook, S.J., and H.L. came by her house and did not leave until about 8:00 p.m. or 8:30 p.m. Cook's third witness, his sister's husband, also testified that Cook, S.J., and H.L., remained with him and his wife until about 8:30 p.m. on March 3, 2012.

¶14. The State called two rebuttal witnesses. The first, Scott Anthony Benton, an assistant professor of pediatrics at UMMC, chief of the Division of Forensic Medicine at UMMC, and medical director of the Children's Justice Center, was tendered and accepted as an expert in the field of pediatric forensic medicine. He testified that, based on "the histories that I've heard [of S.J.], I would expect that there not [] be physical findings in this child," considering that the examination was fifty days after the alleged sexual abuse. He opined that sexual abuse would not necessarily be physically evident in the victim, especially in the context of a male adult penetrating a child, in the absence of force. According to this doctor, "on average bruising to [the vagina as a result of entry] lasts only about a week and it's gone that quick."

¶15. The State also called a notary public, who testified that Cook's brother-in-law had brought her a document, State's Exhibit 2, to notarize. State's Exhibit 2 was purported to be a recantation of S.J.'s claim of sexual abuse against Cook. Signed by S.J., the document read as follows: "Joe did not put his private inside of me." S.J. purportedly had sworn that her mother was with her when she made the statement and that there was no writing below her signature. The notary testified that she notarized the document outside the presence of the

9

child who supposedly had written and signed the document. She could not verify that S.J. had signed the document.

¶16. Following the three-day trial, the jury returned a verdict of guilty on all counts on April 10, 2013. The trial court proceeded to sentencing on April 11, 2013. In 1997, Cook had been convicted twice of grand larceny in Rankin County, Mississippi, Cause Numbers 6699 and 6700, for which he had received two four-year sentences to run concurrently, suspended on condition that he complete successfully a Regimented Inmate Discipline program and five years' supervised probation. The Circuit Court of Rankin County sentenced Cook as an habitual offender under Mississippi Code Section 99-19-81 to two sentences of life imprisonment for Counts I and II and one sentence of twenty years for Count III, to run concurrently.

¶17. Cook timely appealed to this Court, raising the following issues:

1(a)   The children's statements are inadmissible for medical purposes under Mississippi Rule of Evidence 803(4) and should be excluded.

1(b)   The children's statements should be excluded because neither child's statements are admissible under the Tender Years Exception to the rule against hearsay.

2.   The Court committed manifest error in law by allowing the amendment of the indictment to charge the Defendant as a habitual criminal under § 99-19-81 of the Mississippi Code of 1972, Annotated.

**DISCUSSION**

I.   **Whether recorded statements of S.J. and H.L. are inadmissible under Mississippi Rule of Evidence 803(4).**

¶18. Cook argues that the video-recorded statements of S.J. and H.L., which identify Cook as the perpetrator of the crime, constituted inadmissible hearsay under Mississippi Rule of

10

Evidence 801(c). The statements at issue were the audio-recorded "histories"[6] conducted by the nurse practitioner at the University of Mississippi Medical Center's Children's Justice Center (CJC). Over Cook's motion in *limine* to exclude the "histories," the State argued that the statements were admissible pursuant to Mississippi Rule of Evidence 803(4), which allows hearsay statements to be admissible if those statements were made for the purposes of obtaining a medical diagnosis or medical treatment.

¶19.    At the pretrial motion hearing, the trial court took the matter under advisement. When the trial court resumed the matter, after hearing part of the nurse's proposed testimony outside the presence of the jury, the following dialogue occurred:

> THE COURT: All right. We're going to go back on the record here for a second. I've conversed with counsel off the record. We were having a hearing under 803(4) for me to determine whether or not certain disclosures made to [the nurse] were admissible under the Medical Records Exception. It appears that the Defense is not going to challenge that. In fact, they are going to try to introduce the records themselves. So at this point, as I understand it, that both the State and the Defense agrees that her testimony and her records are admissible under 803(4), being first that declarant's motive in making the statement is consistent for purposes of promoting treatment, and;
>
> Second, that the content of the statement is reasonably relied upon in the medical profession in providing treatment and otherwise admissible under 803(4). So with that being made, there's no sense in us going forward. We're outside the presence of the jury. Is the State in agreement with that position?
>
> MS. PURNELL: Yes, sir.

---

[6]According to the nurse at the hearing on Cook's motion in *limine* to exclude audio-recorded statements of S.J. and H.L., prior to the physical examination of a patient, a medical provider conducts what is referred to as a "history," which she defined as follows: "you start like any other provider, with a medical history. You take it from the person that brought the child. And if the child is verbal, we take a history from them also." Audio recordings of the statements of S.J. and H.L., and a transcript S.J.'s interview, appear in the record.

THE COURT: Is Defense in agreement with that position?

MR. MCNEAL: Yes, sir.

THE COURT: Okay. With that then, is there anything else we need to take up before we bring the jury back in?

MR. MCNEAL: Not from the Defense, your Honor.

Without objection from the defense, the audio recordings of the nurse's histories of S.J. and H.L. in which the abuse was disclosed were played in the presence of the jury.

¶20.     This Court will not hold the trial court in error for a matter not presented to it for consideration. *Neider v. Franklin*, 844 So. 2d 433, 436 (Miss. 2003) (citations omitted). In effect, Cook withdrew his motion in *limine* by conceding that the statements of S.J. and H.L. were made for the purposes of diagnosis and treatment under Mississippi Rule of Evidence 803(4), and therefore were admissible as nonhearsay statements. Further, the audio recordings of these statements were marked, entered into evidence, and played for the jury without any objection from Cook's counsel. Cook cannot now claim on appeal that the statements of S.J. and H.L. constitute inadmissible hearsay. We hold that Cook waived this issue, and we decline to consider the merits of the claim.

**II.     Whether various statements of S.J. and H.L. are inadmissible under Mississippi Rule of Evidence 803(25).**

¶21.     Cook claims that various statements of S.J. and H.L. lack the requisite indicia of reliability under Mississippi Rule of Evidence 803(25) and thus should have been ruled inadmissible by the trial court. We find Cook's brief to be unclear about precisely which statements Cook argues were inadmissible. He seems to identify the statements made by S.J.

12

and H.L. to their great-grandmother and the statements made by S.J. to the interviewer at the CEC as the statements which he claims to have been inadmissible under Rule 803(25).[7] He claims that the interviewer employed suggestive techniques to elicit statements from S.J. The standard of review for evidentiary rulings is abuse of discretion. *Bishop v. State*, 982 So. 2d 371, 375 (Miss. 2008) (citing *Lynch v. State*, 877 So. 2d 1254, 1281 (Miss. 2004)). "[T]his Court will not reverse a trial judge's decision on the admissibility of testimony offered at trial unless prejudice amounting to reversible error resulted from such a decision." *Bishop*, 982 So. 2d at 375 (citing *Alexander v. State*, 610 So. 2d 320, 329 (Miss. 1992)).

¶22.    Mississippi Rule of Evidence 803(25) provides:

> A statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide substantial indicia of reliability; and (b) the child either (1) testifies at the proceedings; or (2) is unavailable as a witness: provided, that when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

Miss. R. Evid. 803(25). The comment to Rule 803(25) clarifies the analysis the Court is to conduct regarding indicia of reliability:

> Some factors that the court should examine to determine if there is sufficient indicia of reliability are (1) whether there is an apparent motive on declarant's part to lie; (2) the general character of the declarant; (3) whether more than one

---

[7]Cook's "Motion in *Limine* To Exclude Statement Made To Community Education Center," filed March 19, 2013, references only "the statement made by [S.J] at the Community Education Center as hearsay, as the statement does not meet reliability or corroboration requirements of Mississippi Rule of Evidence 803(25)." Cook's Brief in Support of Motions In *Limine*[] to Exclude Statements," filed on April 8, 2013, references both S.J.'s and H.L.'s statements to the children's great-grandmother, but only S.J.'s statement to the interviewer at the CEC.

person heard the statements; (4) whether the statements were made spontaneously; (5) the timing of the declarations; (6) the relationship between the declarant and the witness; (7) the possibility of the declarant's faulty recollection is remote; (8) certainty that the statements were made; (9) the credibility of the person testifying about the statements; (10) the age or maturity of the declarant; (11) whether suggestive techniques were used in eliciting the statements; and (12) whether the declarant's age, knowledge, and experience make it unlikely that the declarant fabricated. . . .

Miss. R. Evid. 803 cmt. 25. "These factors are not, however, exclusive, and the court must make an overall determination of 'whether the child declarant was particularly likely to be telling the truth when the statement was made.'" **Hennington v. State**, 702 So. 2d 403, 415 (quoting **Griffith v. State**, 584 So. 2d 383, 388 (Miss. 1991) (quoting **Idaho v. Wright**, 497 U.S. 805, 822, 110 S. Ct. 3139, 3150, 111 L. Ed. 2d 638 (1990))).

¶23. The trial court conducted tender-years hearings out of the presence of the jury with regard to the testimony of S.J., H.L., the great-grandmother, and the interviewer. He found both S.J. and H.L. competent to testify. With regard to the great-grandmother's proposed testimony about what S.J. and H.L. had told her, the trial court ruled:

> All right. I have now seen, obviously, both children testify, and I do find both, as previously ruled, [S.J.] and [H.L.] are of tender years; obviously, because of their age, but also, from my view of their testimony here, they are, in fact, still mentally and emotionally of tender years. Further, they both testified so those two prongs have been satisfied.
>
> As I look at the factors in considering the disclosures made to this particular witness, I still—I don't see any motive on the part of either of the declarants to lie. I think that as it relates, especially to [S.J.], the statements were made to—to this witness were, in fact, spontaneous. And as close as I can tell, from those that were made to—by [H.L.] during the part and time when DHS was present, they appeared to be spontaneous.
>
> Timely declarations weighing [in] favor of admissibility concerning both of these disclosures by [H.L.] and [S.J.], they certainly are not remote in time

14

from the date of the alleged event which was in March 2012. The witness is clear that the statements were made, and I think [S.J.] testified that, in fact, she made statements to her grandmother, great-grandmother.

I don't believe that because of the time in there was such a great time after the events that [S.J.] or [H.L.] ran the risk of having a faulty recollection because it was still relatively fresh.

There were no suggestive techniques used in this, and so I find that there's sufficient indicia of reliability so that I find that the statements made by [H.L.] and [S.J.] to this witness are not excluded by the Hearsay Rule as a result of the application of 803(25).

¶24. Without addressing the abuse-of-discretion standard this Court applies to its review of evidentiary rulings, Cook argues that S.J. "had a motive to lie because her great grandmother offered a reward to her if she made false statements about being sexually abused by Defendant." He claims that the statements "were not made spontaneously and there was a delay in the reporting of the statements."

¶25. The great-grandmother testified at the tender-years hearing that S.J. had called her into the bathroom because S.J. though she might have some blood on her underclothes. At some point after that, S.J. "came back and she was really upset and she told me that Joe had raped her." S.J. requested that her great-grandmother not tell anyone about the abuse "because Joe told her what was said behind those walls in the trailer was to stay there and he had threatened to burn their house, the trailer with them in it; he had also threatened to poison their food." The great-grandmother further testified at the tender-years hearing that H.L. had told her that "Joe made him do bad things to his sister." On cross examination at the tender-years hearing, Cook's counsel asked the great-grandmother whether she had given S.J. "gifts during the month of March 2012." She testified that she had given S.J. a computer but could

15

not recall when. S.J. recalled that her great-grandmother gave her an electric scooter and a computer in March of 2012.

¶26.    Nothing in the record suggests that the statements made to the great-grandmother by S.J. and H.L. were based on a motive of either child to lie. That this close relative had given items to S.J., without more, does not evidence a motivation on the part of S.J. to lie. With regard to the general character of the children, both children testified that they understood the difference between lying and telling the truth. The trial court found that the statements were made to S.J.'s and H.L's  great-grandmother and that they were spontaneous. That finding is not contradicted by the record, since S.J., "crying and upset," told her great-grandmother that Cook had raped her. This witness testified that S.J. had disclosed the abuse to her in late March or early April 2012. Since the statement was made a month or less after the event was alleged to have taken place, the trial court found that the statements were not so remote in time as to render remote any recollection of it. Nothing in the record indicates that the great-grandmother used suggestive techniques to elicit the statements from either S.J. or H.L.

¶27.    Finding that the trial court analyzed the indicia-of-reliability factors with regard to the statements of S.J. and H.L. to their great-grandmother, we hold that the trial court did not abuse its discretion in ruling the statements admissible.

¶28.    With regard to S.J.'s video-recorded statements to the interviewer at the CEC, the trial court, after adjudicating S.J. a child of tender years, made the following ruling:

> [T]he last thing for me to consider is the reliability of the statements. I have considered all of those things. From reviewing the statements and the

16

testimony, I detect no apparent motive on the declarant's part to lie. I see that the time of declaration was just a little over two months, I guess March, April, May, a little over two months from the date of the episode; therefore, also the possibility of the declarant's recollection being remote is not true.

According to the statement that was made, the disclosure, this disclosure was occurring after the Defendant had moved out, that she moved out, that apparently the Defendant moved out and within a week after the initial report was made by [S.J.] to her mom and the Defendant was not living with the mom at the time.

[S.J.] indicated that the Defendant had made threats to her not to tell. All of these things makes the timing of this disclosure more trustworthy. There is a certainty that these statements were made. The State will attempt to introduce or record it on the video, so those things are made. This was an independent person. This is not someone that was connected to the witness. I find nothing about [the interviewer] that would cause me to question her credibility. Again, this is not a person that at this point or apparently the State attempts to introduce as an expert.

I reviewed the video. I do not find the techniques used by [the interviewer] to be suggestive; and all things added together, [S.J.]'s age, knowledge and experience make it unlikely that she fabricated the details of these statements that she made to [the interviewer].

So for all those reasons, I find that the statements that [S.J.] made to [the interviewer] on May the 14th, 2012, are not excluded by the hearsay rule as a result of the application of 803(25).

Further, the Court observed the video of S.J.'s statement: "My watching of the video confirmed for me that mentally and emotionally she was, in fact, of tender years at the time of this disclosure statement was made, so I find that she was, in fact, of tender years." The video recording of the interview conducted by the interviewer of S.J. was published to the jury, over the objection of Cook's attorney. With no objection from the State, the video recording of the interview conducted by the interviewer of H.L. was introduced into evidence

17

and was published to the jury by Cook's attorney during cross examination of the interviewer.

¶29. The interviewer testified at the tender-years hearing that she had conducted an interview with S.J. at the Mississippi Community Education Center (CEC) on May 14, 2012.[8] She read the disclosure portion of her Forensic Interview Synopsis into the record, which described what S.J. told her about what Cook allegedly had done to her. This witness further testified that S.J. had told her that Joe "stuck his crotch in her front which she described as private" and that "his crotch went inside of her body but not all the way." Further, "Joe made [H.L.], her brother, stick his crotch in my private." According to this witness, "[S.J.] stated on the incident of March 3rd, 2012, that Joe also touched her and describes this as Joe sticking his fingers inside of her body and moving them around." The interviewer testified that S.J. told her "Joe would threaten to 'poison their food and kill them if they ever told anyone.'"

¶30. Cook makes the argument that "both children made inconsistent statements at different times, citing the interviewer's session with H.L. It is true that, while S.J. disclosed to the interviewer that Cook had abused her, H.L. did not. The interviewer, a female, explained that H.L. "was extremely nervous and uncomfortable to the point that I asked him if he would be more comfortable with a male interviewer." The video reveals that a male

---

[8] The State's attorney erroneously asked the witness whether the interview with S.J. had been conducted on February 14, 2012. She had asked about the interviewer's employment status with the CEC on May 14, 2012, however, just before. And the Forensic Interview Synopsis prepared by the witness reflects that the interview was conducted on May 14, 2012.

interviewer was brought in, but that H.L. still did not disclose any details of the alleged abuse.

¶31. Cook claims that "these statements appear to be the result of coaching and were likely prompted for investigative purposes," noting that "timing of the declarations" was remote. But Cook fails to substantiate his claims and the record is silent on this question. With regard to S.J.'s session with the female interviewer, the record reflects no motive on the part of S.J. to lie. Further, the trial court found that the timing of the declaration, May 14, 2012, just over two months after the alleged event, on March 3, 2012, was not so remote in time to affect S.J.'s recollection. We agree.

¶32. Cook further claims that the female interviewer employed "suggestive techniques" to elicit responses. Having observed the video recording of S.J.'s interview with her, we find that it merely portrays the interviewer inquiring whether S.J. knew why she was at the CEC that day. S.J. responded that she was there to tell the interviewer what had happened with her "mom's boyfriend," whom she identified as Joe Cook. Nothing in the video indicates that the statements made by S.J. to the interviewer were obtained by means of suggestive techniques. The interviewer testified at the tender-years hearing that she had no connection or relationship with S.J. which might have impacted her partiality. Further, the witness testified that she did not use suggestive techniques during her interview with S.J. The trial court ruled that "[S.J.]'s age, knowledge and experience make it unlikely that she fabricated the details of these statements that she made to [the interviewer]."

¶33. We find that the trial court thoroughly analyzed the indicia-of-reliability factors with regard to the statements of S.J. to the female interviewer, and that the trial court did not abuse its discretion in ruling that S.J.'s statements to the witness were admissible under the tender-years exception, MRE 803(25). Cook's assignments of error are without merit.

### III. Whether the Circuit Court of Rankin County erred by amending Cook's indictment to charge him as an habitual offender under Mississippi Code Section 99-19-81.

¶34. The Circuit Court of Rankin County sentenced Cook to two sentences of life imprisonment for Counts I and II and one sentence of twenty years for Count III, all to run concurrently. Cook takes the position that the State failed to meet the "charges separately brought and arising out of separate incidents at different times" element of Mississippi Code Section 99-19-81, arguing that, because the two crimes for which Cook previously was sentenced "happened on or about the same date, September 11, 1997, they happened at the same time," and "it was one incident." Cook raises no claim on the basis of *Gowdy v. State*, 56 So. 3d 540 (Miss. 2010).

¶35. This Court has held that "[t]he standard of review for an amendment of an indictment [] is de novo." *Fulton v. State*, 146 So. 3d 975, 977 (Miss. 2014) (citing *Spears v. State*, 942 So. 2d 772, 773 (Miss. 2006)). Mississippi Code Section 99-19-81 provides:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

20

Miss. Code Ann. § 99-19-81 (Rev. 2007).

¶36.    The State adduced evidence that Cook previously had been indicted for two counts of grand larceny by the Grand Jury of Rankin County on November 18, 1997. The first indictment, Cause Number 6699, charged Cook with willfully, unlawfully, [and] feloniously tak[ing], steal[ing], and carry[ing] away one (1) Yamaha four-wheeler bearing VIN#JY43GHW14MCO97799, valued in excess of $250, the personal property of James Ponder, with the intent to permanently deprive the owner thereof . . ." on or about September 11, 1997. The second indictment, Cause Number 6700, charged Cook with ". . . willfully, unlawfully, [and] feloniously tak[ing], steal[ing], and carry[ing] away one (1) Yamaha four-wheeler bearing VIN#JY459V007GC027051, valued in excess of $250.00, the personal property of Bob Hutchings, with the intent to permanently deprive the owner thereof . . ." on or about September 11, 1997. Cook entered a plea of guilty and the Circuit Court of Rankin County adjudicated him "guilty and therefore convicted of the crime of grand larceny (two counts) as charged in the indictment in Cause Nos. 6699 and 6700." Cook was therefore sentenced to four years in the custody of the Mississippi Department of Corrections (MDOC) in Cause Number 6699 and to four years in the custody of the MDOC in Cause Number 6700, with those sentences to run concurrently. The sentences were suspended on the condition that Cook complete a Regimented Inmate Discipline program and five years' supervised probation.

¶37.    The State argues that Cook had been charged in separate indictments with two separate cause numbers for stealing two different four-wheelers from two different victims

at different locations at two different times. At the sentencing hearing, the State introduced into evidence two offense reports from the Rankin County Sheriff's Office. One of the offense reports stated that a four-wheeler had been taken from 300 Garland Ponder Road in Mendenhall, Mississippi, from one James Ponder. The second offense report stated that a four-wheeler had been taken from one Bob Hutchings at 44 Old Highway 49 South in Jackson, Mississippi.

¶38. It is clear from the record that, in the present case, Cook's prior grand-larceny convictions qualify under the statutory language as "separate incidents at different times" which resulted in "charges separately brought." Although the crimes occurred on the same day, Cook had been charged in two separate indictments for stealing four-wheelers from two different persons in different locations, for which he was prosecuted and convicted in Rankin County. Cook's final assignment of error is without merit. We hold that the Circuit Court of Rankin County did not err in amending Cook's indictment to charge him as an habitual offender pursuant to Mississippi Code Section 99-19-81.

## CONCLUSION

¶39. Finding that Cook's assignments of error are without merit, we affirm his convictions and sentences.

¶40. **COUNT I: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF LIFE IMPRISONMENT, AS AN HABITUAL OFFENDER, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AFFIRMED. COUNT II: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF LIFE IMPRISONMENT, AS AN HABITUAL OFFENDER, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AFFIRMED. COUNT III: CONVICTION OF DIRECTING OR CAUSING A FELONY TO BE COMMITTED BY A PERSON UNDER 17 YEARS OF AGE AND**

22

**SENTENCE OF TWENTY (20) YEARS, AS AN HABITUAL OFFENDER, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AFFIRMED. SAID SENTENCES SHALL NOT BE REDUCED NOR SUSPENDED; NOR SHALL THE APPELLANT BE ELIGIBLE FOR PAROLE OR PROBATION. SAID SENTENCES IMPOSED SHALL RUN CONCURRENTLY WITH EACH OTHER. THE APPELLANT SHALL PAY COURT COSTS, FEES AND ASSESSMENTS IN THE AMOUNT OF $421.50 AND A FINE IN THE AMOUNT OF $10,000 WITHIN SIX MONTHS OF RELEASE. THE APPELLANT SHALL BE GIVEN CREDIT FOR TIME SERVED IN PRETRIAL DETAINMENT.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**