# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-00670-SCT

*JOSHUA DUKES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/18/2022 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| TRIAL COURT ATTORNEYS: | MINOR F. BUCHANAN |
| | TAMETRICE EDRICKA HODGES |
| | T. PATRICK WELCH |
| | ALISON OLIVER KELLY |
| | DAVID FITZGERALD LINZEY |
| | JENNIFER POWELL MALIK |
| | BETHANY KRIS-SHAWN BRIDGES |
| | KEVIN JERRELL WHITE |
| | ROBERT SHULER SMITH |
| | LESLIE R. BROWN |
| COURT FROM WHICH APPEALED: | CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/31/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KITCHENS, P.J., BEAM AND ISHEE, JJ.**

**KITCHENS, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Joshua Dukes was convicted of capital murder and was sentenced to life without parole in the custody of the Mississippi Department of Corrections.[1] Dukes raises three issues on appeal. He contends that 1) the trial court erred when it allowed the State to rebut Dukes's alibi witness with a rebuttal witness who had not been disclosed as required by Mississippi Rule of Criminal Procedure 17.4; 2) his trial was rendered unfair when the State violated the trial court's order in limine pertaining to his other crimes; and 3) hearsay rendered his trial unfair and denied him due process of law.

## STATEMENT OF THE FACTS

¶2.    On February 13, 2016, eighty-five- year- old James Hankins was doing yard work in the front yard of his home on McCluer Road in the City of Jackson when he was shot in the back of the head. Officer Gillis Brown[2] of the Jackson Police Department (JPD) arrived on scene to find Mr. Hankins near his truck, face down in a trailer that was loaded with dirt. Hankins was transported to the University of Mississippi Medical Center, where he died that night.

¶3.    Hankins's wife told the responding officers that she was in her kitchen when she heard what she thought were gunshots. When she went outdoors, she discovered her husband collapsed, face down in a pile of dirt he had been using to fill holes in their yard. At trial, the State asked Detective Brown whether Hankins's wife had said anything about a suspect.

---

[1] Dukes was charged in a multi-count indictment. Count II of the indictment, the murder of James Hankins, was severed and tried separately. This appeal arises from the trial of Count II only.

[2] Detective Brown was a patrol officer at the time of the crime, but at the time of trial, he had become a detective.

Brown responded that Hankins's wife had "advise[d] that she saw a black male running towards Valley Park," which is directly across the street from the Hankins residence. The officer testified also that Mrs. Hankins had seen what the suspect was wearing. Brown said, "she gave me a clothing description of a black male wearing black pants, sweatshirt, running northbound at the direction of Valley Park." Detective Daryl Owens, also a responding officer, testified about other eyewitnesses' descriptions. He reported that "[t]here were actually children outside playing basketball and other things. We were able to get one account from one young female. She advised that she saw a skinny black [male] wearing all black with a gun." Detective Owens testified also that another child playing basketball told him he had seen a brownish car in the neighborhood that had picked up a black male wearing all black.

¶4.     Crime Scene Investigator Kimberly Moses was dispatched to the hospital where Hankins had been rushed into surgery. Moses testified that she collected the clothes and shoes that Hankins had been wearing, but his wallet could not be collected. James Hankins Jr., Hankins's son, testified that his father always had made it a habit to carry his wallet with him and that he always had cash. He testified also that, though he had looked in Hankins's house, yard, truck, and through the items received back from the hospital and law officers, he never was able to locate his father's wallet.

¶5.     At the crime scene, Moses collected a spent shell casing from the ground and a bullet fragment from Hankins's vehicle, both of which were sent to the State Crime Laboratory for

testing. Detective Owens had responded to the scene also, and he testified that he had seen blood and shell casings in the Hankins yard.

¶6. A few weeks later, Detective Jamie White, while working on a different case, was reviewing security footage from a residence in southwest Jackson. He noticed a gold, brownish-colored Buick LaSabre in the video footage that had been taken on the date and at the time of the Hankins homicide. He testified that it stood out to him because of its unique, mismatched bumper. Later that day, while stopped at a traffic light, White saw the same automobile he had observed in the video footage. He asked for backup, and the officers pulled the vehicle over. The driver, Joshua Dukes, and the passenger, Charles Campbell, were arrested, and the vehicle was taken to the City Crime Laboratory for processing. In the car, police found two cell phones, one belonging to Dukes and the other belonging to Campbell, and a black sweatshirt. Dukes and Campbell were released after being interviewed because the officers did not have enough information to hold them.

¶7. After Dukes was released, the Jackson Police Department received an anonymous tip that there was a weapon in Dukes's car hidden underneath the carpet. Officers searched the vehicle again and found a 9-millimeter Glock pistol with an attached laser sight underneath the carpet on the driver's side. The gun was sent to the State Crime Laboratory for testing. The tests results revealed that the casing found in James Hankins's yard had been fired from the weapon found in the Buick LaSabre. Additionally, the bullet found in Hankins's body was consistent with its having been fired by the Glock pistol.

¶8.    Documents found in the glove box of the LaSabre led investigators to believe the vehicle belonged to Latura Willis, Dukes's girlfriend of about a month. During an interview with police, Willis confirmed that the car was hers and she informed the officers that she had given Dukes permission to drive it occasionally. At trial, she testified that in the month and a half that she had been dating Dukes, she had seen him with a gun, specifically a black Glock with an attached laser sight. She testified also that she had never owned a gun and had no knowledge of any gun hidden in her vehicle.

¶9.    Joshua Dukes's cousin, Charles Campbell, who was the passenger in the car with Dukes when they were arrested, gave differing accounts when he was interviewed by police. During his first interview, he told officers that a man named Juvie had killed Hankins. During his second interview, he told officers that Joshua Dukes had killed Hankins. He said he had not told the truth during the first interview out of fear for his cousin. He told the police officers he had decided to come clean because he knew it was the right thing to do. At trial, Campbell testified that, in early 2016, Dukes had told him that he "had caught a body that day," meaning that he had killed someone. Campbell testified also that Dukes told him he had been riding around with someone else that day "looking for a lick," which meant he was looking for someone to rob. According to Campbell, Dukes told him that when he approached an old, white man in his front yard, the man had tried to swing his shovel at him, to which Dukes responded by shooting him and taking his wallet. Campbell testified also that Dukes carried a black Glock with a laser attached to it.

¶10. Dukes told police officers that he was shopping and preparing for a birthday party with his mother, his niece, and a friend named Torrey at the time of the murder. Dukes's mother, Janette Dukes, told police that Dukes was with her and his niece the whole day of the murder, but she did not mention Torrey. Telephone records, however, reveal that Dukes and Torrey had exchanged around fifty calls and texts that day. Cell tower data showed that Dukes's phone was in the service area of the cell tower on the corner of McCluer Road and Terry Road, which is near the Hankins home, around the time of the murder. Additionally, Dukes's phone was in use about a mile and a half away from the Hankins home around the time of the murder. Further, during cross-examination, Janette testified that she would do whatever she could do to help her son.

¶11. At trial, the State called to the witness stand Shirley Campbell, Charles Campbell's mother and Dukes's aunt by marriage. The State asked Shirley Campbell whether in the past she had Janette Dukes's phone number and whether they had texted or spoken on the phone. Shirley testified she had Janette's number and that they had spoken on the phone previously regarding family events. The prosecutor then asked Shirley whether she had ever received text messages from Janette regarding Charles's having given information to the police about Joshua Dukes's involvement in the Hankins murder, and she responded, "I received a threatening message." While the contents of the threatening text message from Janette were never brought up at trial, Shirley testified that she had reported the threats to the police.

¶12. Dukes was found guilty of capital murder, and he was sentenced to life without parole in the custody of the Mississippi Department of Corrections.

6

**STANDARD OF REVIEW**

¶13.    This Court has held that "[t]he standard of review for evidentiary rulings is abuse of discretion." *Cook v. State*, 161 So. 3d 1057, 1065 (Miss. 2015) (citing *Bishop v. State*, 982 So. 2d 371, 375 (Miss. 2008)). "[T]his Court will not reverse a trial judge's decision on the admissibility of testimony offered at trial unless prejudice amounting to reversible error resulted from such a decision." *Bishop*, 982 So. 2d at 375 (citing *Alexander v. State*, 610 So. 2d 320, 329 (Miss. 1992)). "Where error involves the admission or exclusion of evidence, [the] Court will not reverse unless the error adversely affects a substantial right of a party." *Gales v. State*, 153 So. 3d 632, 638 (Miss. 2014) (alteration in original) (internal quotation marks omitted) (quoting *Ladnier v. State*, 878 So. 2d 926, 933 (Miss. 2004)). The reviewing court on an evidentiary matter should only overturn the trial court's decision if it abused its discretion, meaning the decision was arbitrary and clearly erroneous. *Denham v. Holmes ex rel. Holmes*, 60 So. 3d 773, 783 (Miss. 2011). "Abuse of discretion is found when the reviewing court has a 'definite and firm conviction' that the court below committed a clear error of judgment [in] the conclusion it reached upon a weighing of the relevant factors." *Ill. Cent. R.R. v. McDaniel*, 951 So. 2d 523, 526 (Miss. 2006) (internal quotation marks omitted) (quoting *Howard v. TotalFina E & P USA, Inc.*, 899 So. 2d 882, 888 (Miss. 2005)).

**DISCUSSION**

**I.      The trial court did not err by allowing the testimony of Shirley Campbell because her testimony did not have to be disclosed pursuant to Mississippi Rule of Criminal Procedure 17.4.**

7

¶14. On appeal, Dukes argues that the trial court erred by allowing the testimony of Shirley Campbell to rebut Dukes's alibi witness, his mother, Janette Dukes. Dukes argues that this was error because the State did not disclose Shirley Campbell as a rebuttal witness under Mississippi Rule of Criminal Procedure 17.4. The State countered that, because Campbell was a rebuttal witness, not a witness in its case-in-chief, such disclosure was not required. Additionally, the State argued that Campbell's testimony was not provided to rebut Janette Dukes's testimony regarding her son's whereabouts on the day of the murder. Rather, her testimony was offered for the purpose of attacking the credibility of Janette Dukes and to show that she was biased, as allowed by Mississippi Rule of Evidence 616. After much discussion and deliberation, the trial court accepted the State's argument that Shirley Campbell's testimony would be allowed "for the limited purpose of proving contradictory or inconsistent, prior inconsistent statements."

¶15. On appeal the State argues that Rule 17.4 does not apply to Shirley Campbell's testimony because the State did not use her testimony to rebut the alibi testimony of defense witness Janette Dukes. The State contends that the testimony was used to attack Janette Dukes's credibility. The defense concedes that the State had disclosed Shirley Campbell to the defense as a potential witness. Under these circumstances, the trial court did not err by allowing her testimony. She did not, in fact, dispute the alibi testimony of Janette Dukes.

## II. The trial court did not err by denying Dukes's motions for mistrial.

¶16. The four counts of Joshua Dukes's indictment were severed, and the State proceeded to try him on Count II for the alleged capital murder of one James Hankins. Prior to trial, the

8

trial court entered an order in limine that prohibited the State from "disclosing to the jury any of the multiple counts of this indictment other than the facts of Count II (James Hankins)" and "from disclosing to the jury the fact that this defendant has any other charges against him other than the count for which he is being tried."

¶17.    On appeal, Dukes argues that he was prejudiced because the State violated the order in limine by allowing evidence of Dukes's other crimes. He argues also that the trial court erred by denying his two related motions for mistrial.

¶18.    "The decision of whether to grant a mistrial lies within the sound discretion of the trial court[.]" ***Clark v. State***, 40 So. 3d 531, 538 (Miss. 2010) (citing ***Dora v. State***, 986 So. 2d 917, 921 (Miss. 2008)), *disagreed with on other grounds by* ***Portis v. State***, 245 So. 3d 457 (Miss. 2018). The trial court's refusal to grant a mistrial is reviewed using an abuse of discretion standard. ***Id.*** (citing ***Dora***, 986 So. 2d at 921). "If the trial court determines that an error occurred in the proceedings that substantially and irreparably prejudiced the defendant's case, the court must grant a mistrial." ***Id.*** (citing ***Harrell v. State***, 947 So. 2d 309, 316 (Miss. 2007)). In reviewing the trial court's decision of whether or not to grant a mistrial, the court should afford the trial court considerable discretion since it was "best positioned to evaluate the prejudicial effect." ***Id.*** (citing ***Harrell***, 947 So. 2d at 316).

¶19.    The first motion for mistrial was made during the State's direct examination of Investigator Jamie White. The State had asked Officer White how Dukes was arrested for Hankins's murder, without referencing any of the other counts charged against Dukes. In an attempt to dispel Dukes's claim that the gun had been planted in his car, Officer White

9

testified that he had gone to recover video surveillance footage in an unrelated case, and he "observed a vehicle." The defense then objected. Outside the hearing of the jury, the defense objected to the State's going into this line of questioning and assumed the location at which White had obtained the footage was related to the other counts. The State countered that its line of questioning was to ensure that the jury knew that the officers did not stop Dukes without cause. The prosecutor explained that Officer White had seen the vehicle on surveillance footage while investigating an unrelated crime. Later, by chance, he saw the vehicle on the road next to him and pulled it over. The trial court overruled the defense's objection.

¶20.    The State continued its examination by asking Officer White whether he had seen anything on the video footage. He replied saying, "I observed a vehicle that was behaving in a manner consistent with the details of the crime that Detective Jackson informed me of." The State then asked, "[a]nd that's not related to this?" Before White could answer, however, the defense objected. Again outside the presence of the jury, the defense argued the testimony violated the order in limine because the State "was getting deeper into the facts of another count." The State countered that Officer White "was looking at surveillance footage for another separate unrelated incident. He saw a vehicle that looked suspicious based on the way it was behaving in relating to that crime. He then saw that vehicle out. He just happened to see it." The trial court did not explicitly sustain or overrule the objection, but merely told the State to move forward. The State subsequently showed White a photograph of the vehicle from the security footage and asked whether that was the vehicle that he had seen. White

10

confirmed that it was, and the State moved to introduce the picture into evidence. Dukes then objected and moved for a mistrial.

¶21.   Dukes argued that the State violated the order in limine because it had elicited testimony about Counts III and IV of the indictment. The State countered that White had not testified about another crime scene, which the record confirms. No security footage was shown from Counts III and IV. White noticed the car while reviewing security footage from a different crime that he was investigating; he made it clear that it was unrelated to the charge on trial.

¶22.   After much deliberation, the trial court found that the testimony did not reference Counts III and IV. It ruled the following:

> The officer was investigating another crime that was not related to this crime, and he notices this vehicle because it had certain characteristics that caused him to notice it. That's as far as we've gotten. We haven't gotten into anything else. So I'm having difficulty because I don't know, just as the jury doesn't know, what those other counts are about. They don't even know that there are other counts, only you know that. And so at this point in time based off of the testimony I can't see where they would think – my only consideration is that there was a gold car on the video when he was investigating another crime. I'm not seeing where there has been a direct correlation to the two crimes.

The trial court took a recess to consider whether or not to grant the mistrial. The court denied the defense motion, finding that a mistrial was not warranted. The trial court noted that no testimony heard by the jury connected the surveillance footage to Counts III and IV, reasoning that the jurors did not know what Counts III and IV were or that they even existed.

¶23.   We find that the trial court did not abuse its discretion because its decision was neither arbitrary nor clearly erroneous. The testimony  did not prejudice Dukes in any way because,

11

as the trial court pointed out, the jury did not know that there were other charges against Dukes, much less what they were. Given the considerable discretion afforded to trial courts in granting or denying mistrials, we cannot say the trial court abused its discretion. This issue is without merit.

¶24. Dukes argues also that the trial court improperly denied his second motion for mistrial. During the State's case-in-chief, Federal Bureau of Investigation Agent Williams was called to testify concerning Dukes's movement on the day of the Hankins murder. Agent Williams explained that cell phone records and a cell phone analysis showed that Dukes's telephone was about a mile and a half away from the Hankins home around the time of the murder, which was illustrated by a PowerPoint presentation that was admitted into evidence later.

¶25. During Agent Williams's testimony, Dukes objected and asked for a mistrial because an address relating to Counts III and IV of the indictment was displayed on one of the PowerPoint slides shown to the jury. The State responded by arguing that the slide was up for "half a second" before Agent Williams clicked to the next slide, and there was no testimony implicating Dukes in any other crimes or prior bad acts. The defense, attempting to counter, said that the slide was up for "a matter of a few seconds," rather than half a second.

¶26. The trial court denied Dukes's motion, determining that the appearance of the address on the screen for the short time that it was did not require a mistrial. Again it reasoned that the jury did not know Counts III and IV existed; so the momentary appearance of the address

on the PowerPoint did not prejudice Dukes, and it did not warrant a mistrial. Additionally, the address was redacted from the PowerPoint before it was given to the jury.

¶27. The purpose of the order in limine was to prevent prejudice to the defendant. As the trial court determined, the momentary appearance of an address on a slide did not prejudice Dukes. The jurors had no reason to know or believe that Dukes was being charged with other crimes. Additionally, there was no testimony about Counts III and IV to implicate Dukes as a participant in other crimes. For these reasons, we find that the trial court did not abuse its discretion by denying Dukes's second motion for mistrial.

### III. Dukes's trial was not rendered unfair by hearsay, and Dukes was not denied due process.

¶28. Dukes asserts that there were two occasions during his trial that he was unfairly subjected to hearsay. He contends first that the trial judge sustained a hearsay objection from Dukes during a bench conference, but the ruling was not heard by or communicated to the jury. The second hearsay instance, Dukes contends, arose from an erroneous ruling and abuse of discretion by the trial court.

### A) First Hearsay Argument

¶29. The first instance of hearsay of which Dukes complains occurred during Detective Daryl Owens's testimony. During the weeks following the murder, JPD officers continued to investigate and revisit the crime scene with the goal of finding a suspect. While Owens was on the stand, the State asked him what he had learned throughout the course of the investigation. To this overly broad question he responded:

13

> Nothing other than that the motive was possibly robbery. At that particular time, his wallet was missing. This come from – we learned from officers that Mrs. Hankins advised that he had his wallet at that particular time–

After Owens had made this statement, the defense objected, and the court held a bench conference outside the presence of the jury. Defense counsel contended that the testimony was double hearsay directly relating to one of the elements of the charge, robbery. The State countered that the testimony fell under the excited utterance exception. The trial court sustained Dukes's objection. Defense counsel did not ask the trial court to instruct the jury to disregard the testimony.

¶30.    Regarding this instance of hearsay, Dukes's argument on appeal is that even though the trial court sustained the objection, the jury did not hear that it was sustained, and the trial court did not specifically instruct the jury to disregard Owens's testimony.

¶31.    This Court has held that once a hearsay objection has been sustained, there is no error. **Simmons v. State**, 813 So. 2d 710, 717 (Miss. 2002). Additionally, when the defense fails to ask the trial court to instruct the jury to disregard the hearsay, the "sustaining of the objection was sufficient to prevent reversible error." **Cotton v. State**, 675 So. 2d 308, 315 (Miss. 1996). "There is no reversible error where the court did all that it was asked to do." **Id.** (citing **Clanton v. State**, 279 So. 2d 599 (Miss. 1973)). Once the trial court sustained the defense's objection, it had no further duty. **Walker v. State**, 671 So. 2d 581, 603 (Miss. 1995). Also, it is the defense's duty to obtain a ruling from the trial court on an objection. **Rials v. Duckworth**, 822 So. 2d 283, 287 (Miss. 2002). "This Court has held that a defendant waives his objection 'where an objection [is] made and a definitive ruling [is] not obtained

nor any corrective action requested.'" ***Id.*** (alterations in original) (quoting ***Walters v. State***, 720 So. 2d 856, 864 (Miss. 1998)). Because the trial court properly sustained Dukes's objection and Dukes did not ask the trial court to tell the jury to disregard the hearsay, there is no error.

¶32.   Dukes admits that this issue was not properly preserved on appeal, so he requests the Court examine it now under a plain error analysis. "Under the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant . . . and which affects a defendant's 'fundamental, substantive right.'" ***Conners v. State***, 92 So. 3d 676, 682 (Miss. 2012) (alteration in original) (internal quotation marks omitted) (quoting ***Smith v. State***, 986 So. 2d 290, 294 (Miss. 2008)). "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" ***Id.*** (alteration in original) (quoting ***Brown v. State***, 995 So. 2d 698 (Miss. 2008)). Here, however, the trial court did not err because it sustained the objection and there was no harm to Dukes's fundamental rights. Thus, a plain error analysis is not appropriate.

**B)     Second Hearsay Argument**

¶33.   The second instance of hearsay that Dukes argues prejudiced him occurred during Detective Terrence Jackson's testimony. Jackson had interviewed Charles Campbell regarding the Hankins homicide, and the State asked him what he had learned during his investigation and interview with Campbell. Before Jackson could answer this extremely broad and open-ended question, however, the defense objected on hearsay grounds. The State

responded that it had asked only what Jackson had learned during the course of his investigation; it did not ask what anyone had said. The trial court overruled the objection, stating:

> The officer can testify about what he learned during his investigation. Now, if the question is asked in a manner that clearly elicits hearsay and he goes into saying that this person said this, then we do have a hearsay issue. But the officer can testify about what he learned and what he discovered during his investigation.

¶34. The State continued its examination of Jackson. After asking about the gun found in the car Dukes was driving, the State asked Jackson, "[d]uring the course of your investigation, was there evidence that this gun was involved in the murder of James Hankins?" Jackson responded, "[y]es, it was." At this point, the defense objected on hearsay and confrontation clause grounds, contending that Jackson's information had come from the crime laboratory report. The State countered that the line of questioning involved Jackson's "investigatory steps, what happened next, and how he moved forward with his investigation." The State argued that when officers receive results from the crime laboratory, that is when they determine whether or not they are going to move forward with the case. The trial judge overruled the objection, holding that the State has a right to ask Jackson questions about the investigation and what he learned. Dukes argues that the trial court erred by allowing this part of Jackson's testimony because it was hearsay.

¶35. Mississippi Rule Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." MRE 801(c). When

16

an officer's testimony is being used to explain why he did what he did in the course of his investigation, not to prove the truth of the matter asserted, then the testimony is not hearsay and is therefore admissible. *See Eubanks v. State*, 291 So. 3d 309, 322-23 (Miss. 2020) ("Statements do not constitute hearsay when admitted to explain an officer's course of investigation or motivation for the next investigatory step by that officer." (internal quotation marks omitted) (quoting *Smith v. State*, 258 So. 3d 292, 309 (Miss. Ct. App. 2018))). Here, the crime laboratory report was not being used to prove the truth of a matter that was being asserted. Rather, Detective Jackson responded to a question—albeit a leading question—that sought to elicit from him explanation of why he did what he did as he proceeded with his investigation.

¶36. We find that the trial court committed no error by allowing this testimony.

## CONCLUSION

¶37. Finding no reversible error, we affirm Dukes's conviction.

¶38. **AFFIRMED.**

**RANDOLPH, C.J., KING, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**