# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00711-COA

**LORENZO MANUEL**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                               **APPELLEE**

DATE OF JUDGMENT:            10/06/2017
TRIAL JUDGE:                HON. JEFF WEILL SR.
COURT FROM WHICH APPEALED:  HINDS COUNTY CIRCUIT COURT,
                            FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:    THOMAS M. FORTNER
                            JENNIFER LYNN McGUIRE ROGERS
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:          JODY EDWARD OWENS II
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 03/22/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Lorenzo Manuel appeals from his convictions and sentences for second-degree murder and aggravated assault. Manuel argues that the trial court erred by admitting testimony under the excited utterance exception to the hearsay rule; by excluding other testimony as hearsay; by excusing a juror mid-trial for failing to disclose information during voir dire; by collecting the parties' jury panel information sheets following jury selection and placing them under seal; and by sentencing him as a habitual offender. We find no reversible error and therefore affirm Manuel's convictions and sentences.

**FACTS AND PROCEDURAL HISTORY**

¶2.     Around 1:30 a.m. on April 1, 2015, Justin Shannon returned home to the Jackson apartment he shared with his girlfriend, Keandria Mitchell. Shannon had been at the Black Diamonds Club, a local strip club. Shannon was agitated and told Mitchell that he had gotten into a fight with Robert Manuel (Robert) at the club. Shannon told Mitchell he "ran out of the club and hit the gate as he was leaving from the club to get away." Shannon was so upset that "it took [Mitchell] probably 30, 40 minutes to calm him down." Eventually, they went to bed.

¶3.     In the morning, Shannon and Mitchell drove to Shannon's other residence in West Jackson. While there, Shannon received a series of phone calls from Robert's brother, Lorenzo Manuel (Manuel). Manuel was angry about the fight the night before and wanted to know where Shannon was. Manuel said, in substance, that he and Robert were "fixing to pull up and that they [were] going to handle this man to man and that it was messed up for [Shannon] to do [Robert] how he did him." This made Shannon angry.

¶4.     Shannon and Mitchell drove to Frank Hobson's house about two blocks away. Hobson was in his front yard, and Shannon stopped in the street to talk to him. Suddenly, another car pulled up next to them. Manuel was in the front passenger seat, and Robert was in the backseat on the passenger side. Mitchell could not see who was driving the car. Manuel and Robert immediately began shooting at Shannon and Mitchell. Shannon pushed Mitchell down to protect her. Shannon told Mitchell he was sorry, that he never thought the Manuels would do something like that to him, and that he never meant to put her in harm's

2

way.  After the shooting finally stopped, the Manuels' car drove away.  Both Shannon and Mitchell had been shot.  Hobson got in their car and drove them to the hospital.

¶5.    Shannon had been shot six to eight times and was pronounced dead at the hospital. Mitchell had been shot thirteen times.  She survived, but she cannot work and is on disability as a result of her injuries.  A bullet is still lodged in her liver and remains life-threatening.

¶6.    At the hospital, Mitchell identified Manuel and Robert as the shooters.  Manuel and Robert were arrested and indicted for first-degree murder, aggravated assault, and shooting into a vehicle.  Following a jury trial, Manuel was convicted of second-degree murder and aggravated assault but acquitted of shooting into a vehicle.[1]  The court sentenced Manuel to serve consecutive terms of forty years and twenty years as a nonviolent habitual offender in the custody of the Department of Corrections.  Manuel filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

¶7.    On appeal, Manuel argues that the trial court erred by (1) allowing Mitchell to testify regarding Shannon's statements about his altercation with Robert at the Black Diamonds Club; (2) excluding testimony about out-of-court statements that Mitchell allegedly made at the hospital after the shooting; (3) striking a juror mid-trial for failing to disclose information during voir dire; (4) collecting all jury panel information sheets following jury selection and placing them under seal; and (5) sentencing him as a habitual offender.

**ANALYSIS**

---

[1] Robert pled guilty to second-degree murder and aggravated assault but later filed a motion for post-conviction relief attacking his plea.  *See Manuel v. State*, 304 So. 3d 713 (Miss. Ct. App. 2020).

## I. The trial judge did not abuse his discretion by finding that Shannon's statements to Mitchell were excited utterances.

¶8. Prior to trial, Manuel filed a motion in limine to prohibit Mitchell from testifying about any statements that Shannon had made about the fight between him and Robert at the Black Diamonds Club. Manuel argued that such testimony was inadmissible hearsay. In response, the State argued that the relevant testimony was admissible as an "excited utterance" under Mississippi Rule of Evidence 803(2). In a proffer, Mitchell testified that when Shannon arrived home around 1:30 a.m., he told her that he had just been involved in a fight with Robert at the Black Diamonds Club. She testified that the club was about a fifteen-minute drive from her apartment. She stated that Shannon "was fidgeting, he was pacing back and forth, and he was very angry." As noted above, she later testified that Shannon told her he ran out of the club and struck a gate as he was leaving in his car. She also stated that it took her thirty to forty minutes to get Shannon to calm down. The trial judge found that her testimony was admissible under Rule 803(2). On appeal, Manuel argues that the trial judge's ruling was an abuse of discretion.

¶9. Rule 803(2) provides that an out-of-court "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," is "not excluded by the rule against hearsay." The Advisory Committee Note to the rule explains:

> The underlying theory of the excited utterance exception is that circumstances may create such an excited condition that the capacity for reflection is temporarily impeded and that statements uttered in that condition are thus free of conscious fabrication. . . . [T]he essential ingredient here is spontaneity. With respect to the time element, the issue is the duration of the excited state. This, depending on the exact circumstances of a case, can vary greatly. The declarant need not be a participant but only an observer of the event which

4

> triggered the excitement. An excited utterance need only "relate" to the startling event, and, therefore, the scope of the subject matter of the statement may be fairly broad.

MRE 803 advisory committee note.

¶10. "Appellate review of determinations of whether to admit hearsay is limited to whether an error of law occurred, and if it did not, then appellate review is limited to the abuse of discretion standard." *In re E.G.*, 191 So. 3d 763, 770-71 (¶24) (Miss. Ct. App. 2016) (quoting *Shirley v. State*, 843 So. 2d 47, 48 (¶3) (Miss. Ct. App. 2002)). "The competency of excited utterances is a matter largely discretionary with our trial courts." *C.A.M.F. v. J.B.M.*, 972 So. 2d 656, 664-65 (¶35) (Miss. Ct. App. 2007) (quoting *Stokes v. State*, 797 So. 2d 381, 386 (¶14) (Miss. Ct. App. 2001)). "The determination of spontaneity 'is a question for the trial judge, whose action should not be overturned unless this Court would be justified in concluding that under all and any reasonable interpretation of the facts, the exclamation could not have been spontaneous.'" *Wells v. State*, 849 So. 2d 1231, 1236 (¶11) (Miss. 2003) (quoting *Clark v. State*, 693 So. 2d 927, 932 (Miss. 1997)).

¶11. Lorenzo argues that Shannon's statements to Mitchell were not excited utterances because the fight occurred at the club, and Shannon had driven home before relating the event to Mitchell. However, "[t]here is no hard and fast rule regarding the interval of time that passes between an event and an utterance before the remark necessarily must be classified as outside the excited utterance exception to the hearsay rule." *Barnett v. State*, 757 So. 2d 323, 329 (¶17) (Miss. Ct. App. 2000). Whether too much time has passed "is a question to be resolved by the trial court in its sound discretion." *Id.* The circumstances of

5

the statements at issue in this case are comparable to other cases in which this Court and the Mississippi Supreme Court have upheld the admission of testimony under Rule 803(2).

¶12. Recently, in *Garcia-Lebron v. State*, 323 So. 3d 1159 (Miss. Ct. App. 2021), this Court held that a trial judge did not abuse his discretion by admitting testimony as an excited utterance even though "several hours had passed since" the underlying event. *Id.* at 1165 (¶24). In *Garcia-Lebron*, the declarant (Anna) fled her home on foot after her fiancé had beaten her and her son. *Id.* at 1164-65 (¶20). Several hours later, after walking about four-and-a-half miles, she knocked on the door of another house and told the occupant (Mendoza) about the abuse she and her son had experienced. *Id.* at 1160-61, 1165 (¶¶2, 4, 24). "Mendoza . . . described Anna as 'very hysterical and crying and bleeding' when she showed up on his doorstep . . . ." *Id.* at 1165 (¶24). Relying on Rule 803(2), the trial judge admitted Mendoza's testimony about what Anna had told him. *Id.* at 1164-65 (¶20). On appeal, this Court held that the trial judge did not abuse his discretion because "[a]lthough several hours had passed since the actual abuse, Anna was certainly still under the influence of the events" when she spoke to Mendoza. *Id.* at 1165 (¶24).

¶13. Similarly, in *Barron v. State*, 130 So. 3d 531 (Miss. Ct. App. 2013), the trial judge allowed two witnesses to testify about out-of-court statements that were made ten to twenty minutes after the declarant had been involved in an altercation and witnessed a shooting. *Id.* at 535, 537-38 (¶¶4-5, 21). On appeal, we held that the trial judge did not abuse his discretion by allowing the witnesses to testify regarding the declarant's statements about the altercation and the shooting. *Id.* at 537-38 (¶¶21-23). We reasoned that although the

6

statements at issue "occurred approximately ten to twenty minutes after the shooting," "[t]he record suggest[ed] that [the declarant] was still under the excitement of the event" because one of the witnesses testified that the declarant "seemed to be in shock and was visibly 'shaken up.'" *Id.* at 538 (¶21).

¶14. Finally, in *Carter v. State*, 722 So. 2d 1258 (Miss. 1998), the Supreme Court held that the trial judge did not abuse his discretion by allowing a police officer to testify about statements made by a declarant (Cooley) about ten minutes after Cooley had witnessed a shooting. *Id.* at 1261 (¶11). Although the officer testified that at the time Cooley made the statements, "Cooley wasn't hysterical and was 'calm in a way,' he also said that Cooley was upset and crying and spoke in an excited manner." *Id.* The Supreme Court held that the trial judge did not abuse his discretion by admitting the officer's testimony because the record indicated that Cooley's statements "were spontaneous enough to fall under the excited utterance exception." *Id.*

¶15. Likewise, in this case, Mitchell testified that Shannon was agitated, angry, and pacing when he arrived back at their apartment. Shannon had fled the Black Diamonds Club after the altercation and hit a gate as he was leaving. Mitchell testified that the club was only about a fifteen-minute drive from her apartment. She also testified that it took her thirty or forty minutes to calm Shannon. Under these circumstances, there was sufficient evidence for the trial judge to find that Shannon's statements "were spontaneous enough to fall under the excited utterance exception." *Id.* Therefore, we cannot say that the trial judge abused his discretion by admitting Mitchell's testimony.

7

**II. The trial judge did not abuse his discretion by finding that Mitchell's alleged statements at the hospital were hearsay and not excited utterances.**

¶16. After the State rested its case-in-chief, Manuel attempted to call Mitchell's friends Donna McCall and Monique Carter to testify about statements Mitchell allegedly made at the hospital after the shooting. When the State objected to the testimony as hearsay, Manuel argued that Mitchell's statements were admissible under Rule 803(2) as excited utterances. McCall and Carter then testified by proffer outside the presence of the jury.

¶17. McCall testified that Mitchell called her shortly after the shooting and said that she had been shot and was on her way to the hospital. McCall went to the hospital. At some point, McCall called Carter, and Carter joined her at the hospital. McCall testified that she did not get to see Mitchell immediately after she arrived at the hospital. Rather, she "had to wait until some people came out[,] and [Mitchell's] mother came out and got [her and Carter]." McCall testified that "[p]robably like . . . no more than two hours" elapsed between the shooting and when she was able to see Mitchell at the hospital. McCall testified that when she and Carter went to Mitchell's room, Mitchell "was just talking to us normal." McCall testified that when she asked Mitchell who had shot her, Mitchell said that she "couldn't see because [Shannon had been] covering [her]" during the shooting. McCall testified that Mitchell "got upset" at that point and "started crying again."

¶18. Carter testified similarly regarding Mitchell's alleged statements. Carter testified that she went to Mitchell's room about twenty minutes after Carter arrived at the hospital. However, it is not clear how long after the shooting Carter arrived at the hospital.

8

¶19.    The trial judge excluded McCall's and Carter's testimony after finding that Mitchell's alleged statements were not excited utterances under Rule 803(2). The judge found that by the time McCall and Carter were allowed to see Mitchell at the hospital, Mitchell was no longer "under the stress of excitement" caused by the shooting. MRE 803(2). The judge noted that based on McCall's testimony, she and Carter did not see Mitchell until as many as two hours after the shooting. The judge found that to the extent Carter testified that they saw Mitchell shortly after the shooting, her testimony was contradicted by McCall's testimony and simply was not credible. The judge reasoned it was not credible that two non-family members were "spirited back in there to have a conversation with the victim" shortly after "she had been shot 14 times [sic], including in the liver."

¶20.    As noted above, "[t]he competency of excited utterances is a matter largely discretionary with our trial courts." *C.A.M.F.*, 972 So. 2d at 664-65 (¶35) (quoting *Stokes*, 797 So. 2d at 386 (¶14)). In this case, the conversation at issue occurred as many as two hours after the shooting, and Mitchell was "just talking . . . normal." By this time, Mitchell had received medical treatment, and her condition had stabilized to the point that she could see visitors. Under these circumstances, we cannot say that the trial judge abused his discretion by finding that Mitchell was no longer "under the stress of excitement" when she spoke to McCall and Carter. MRE 803(2). Accordingly, the trial judge did not abuse his discretion by excluding their testimony pursuant to the hearsay rule.

¶21.    Manuel also briefly argues that the exclusion of McCall's and Carter's testimony violated "his constitutional right to confront his accuser" (Mitchell). However, Mitchell

testified at trial and was subject to full cross-examination. Moreover, Manuel did not argue at trial that Mitchell's alleged statements were admissible to impeach Mitchell. *See* MRE 613(b). Accordingly, this argument is without merit.

### III. The trial judge did not abuse his discretion by excusing a juror and replacing her with an alternate, nor can Manuel show that he was prejudiced by the substitution.

¶22. During voir dire, the judge asked the potential jurors whether any of them had a "family member" who had been convicted of a felony. Prior to the third day of trial, the court learned that one juror, M.J., lived at the same address as another individual with the same surname who had been the subject of a multi-count indictment for, inter alia, being a felon in possession of a weapon. Although that indictment was nolle prosequied, it did indicate that a family member living at the same address as M.J. had a prior felony conviction—a fact that M.J. failed to disclose during voir dire. The judge and counsel then questioned M.J. outside the presence of the other jurors. M.J. testified that her listed address was actually her grandmother's house. She said that she used the address to "go to school on" but had not lived there since she was four years old. She was then asked about two cousins and an uncle who used the same address. She stated two of them lived at the address, and the third only used it for school. She stated that she knew that one of them sold drugs, that another had "a long list of . . . crimes," and that the third had been "in some trouble a while back." She explained that she did not respond to the judge's question during voir dire because she only knew that they had committed "crimes" and "didn't know for sure if they had felonies." The judge ultimately dismissed M.J. from the jury over Manuel's objection.

10

On appeal, Manuel argues that the trial judge abused his discretion because M.J. "did not have any specific knowledge about her distant relatives' criminal history."

¶23. "The dismissal of a juror for good cause and her replacement with an alternate is within the sound discretion of the trial judge." *Stevens v. State*, 513 So. 2d 603, 604 (Miss. 1987). In addition, a defendant alleging that a juror was erroneously dismissed and replaced by an alternate must "show actual prejudice resulting from the excusal and substitution." *Shaw v. State*, 540 So. 2d 26, 28 (Miss. 1989). As this Court has put it, although a defendant "has the right to be tried by a fair and impartial jury, he does not have a vested right to any particular juror." *Horton v. State*, 726 So. 2d 238, 248 (¶41) (Miss. Ct. App. 1998).

¶24. Applying these standards, Manuel fails to establish reversible error. To begin with, we cannot say that the trial judge abused his discretion because the record supports the judge's finding that M.J. was less than forthcoming during voir dire. More important, Manuel wholly fails to "show actual prejudice." *Shaw*, 540 So. 2d at 28. Indeed, Manuel does not even attempt to explain how he was prejudiced by M.J.'s dismissal, and nothing suggests that the alternate who replaced M.J. was anything but a qualified and impartial juror. Accordingly, this issue is without merit.

### IV. The trial judge did not abuse his discretion by collecting all jury panel information sheets and placing them under seal during trial, nor can Manuel show that he was prejudiced by this precaution.

¶25. On the morning of the second day of trial, the judge informed counsel that a juror had reported to a bailiff that she had been contacted the previous evening and believed that the contact was related to the case. Outside the presence of the other jurors, the juror stated that

11

a high school classmate ("Michael"), whom she had not seen in years, sent her a Facebook message the previous evening and asked her to "call [him] real quick." When the juror called him, Michael said that he and "Mook" "need[ed] to see [her] in person" that night because they "need[ed] to ask her something." The juror had seen "Mook" at the courthouse that day and believed that his presence was related to the case. The juror felt threatened because Michael and Mook wanted to meet in person but would not say why or what they needed to ask her. The juror stated that she had not spoken to Michael or Mook in years and that there was no reason for either of them to have contacted her. The juror declined to meet with them and instead reported the incident to a bailiff the next morning. Without objection, the judge excused the juror and replaced her with an alternate. In addition, the prosecutor reported that witnesses in the case had received threats from persons related to or associated with Manuel, and a bailiff reported that Manuel had removed his copy of the jury panel information sheets from the courtroom during the first day of trial. Based on this information, the judge directed counsel to hand their jury panel information sheets to his court administrator to be kept for the duration of the trial. The judge stated that the sheets were being collected "for security reasons" only and would be kept under "seal" and would "not be looked at by anybody." Manuel did not object. Indeed, Manuel's counsel stated that he had left the sheets "on [his] kitchen table" because he "didn't think he would need [them]." Counsel offered to retrieve the sheets and bring them to the court administrator during lunch.

¶26. On appeal, Manuel argues that the judge's directive regarding the jury panel information sheets violated Rule 17.6(a)(1) of the Mississippi Rules of Criminal Procedure

12

by requiring counsel to disclose attorney work product. Manuel also argues that the judge's directive required his trial attorney to disclose confidential information in violation of Rule 1.6 of the Mississippi Rules of Professional Conduct.

¶27. This issue is both procedurally barred and without merit. Manuel waived the issue because he did not object at trial. *See, e.g.*, *Smith v. State*, 724 So. 2d 280, 313 (¶127) (Miss. 1998) ("A trial judge will not be found in error on a matter not presented to him for decision." (quoting *Jones v. State*, 606 So. 2d 1051, 1058 (Miss. 1992))). In addition, Manuel fails to articulate how he was prejudiced by this precaution. Indeed, his trial counsel had left the sheets at home because "didn't think he would need [them]." Finally, counsel was not required to disclose work product or confidential client information because the sheets were kept under seal and not disclosed to anyone.[2]

### V. Manuel's habitual-offender sentence is not plain error or a manifest miscarriage of justice.

¶28. Manuel's indictment alleged that he was a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2020) because he had been convicted of at least two prior felonies, namely, the sale of hydrocodone in Hinds County Circuit Court case number 08-1-180-01, and the sale of hydrocodone in Hinds County Circuit Court case number 08-1-181-01. In conformity with section 99-19-81, the indictment also alleged that the two prior convictions were based on "charges separately brought" and arose "out of separate incidents

---

[2] For this reason, the only case that Manuel cites—*Thorson v. State*, 721 So. 2d 590 (Miss. 1998)—is readily distinguishable. In *Thorson*, the Supreme Court held "that the defense is not entitled to discover a prosecutor's notes made about jurors during the voir dire." *Id.* at 596 (¶15). Here, the State did not "discover" anything because both sides' jury panel information sheets were kept under seal for the duration of trial.

at different times." Both prior convictions and sentencing orders were entered on the same date, March 9, 2009.

¶29. At Manuel's sentencing hearing, the State introduced certified copies of the sentencing orders from Manuel's two prior convictions. The judge initially noted that the two orders appeared to be "identical" and asked the State for clarification. The prosecutor then pointed out that the orders were from two different cases. The judge asked whether the State had "anything further," and the prosecutor stated, "No, Your Honor, other than the fact that I believe that we've presented evidence that shows that he has been charged with two different felonies arising out of separate charges, separate times, and sentenced to a term of one year or more." The judge then asked whether Manuel had any evidence or argument he wished to present, and defense counsel stated that he had nothing to present other than letters of support for Manuel, which the judge had already received and reviewed. The judge then sentenced Manuel as a habitual offender under section 99-19-81.

¶30. In his opening brief on appeal, Manuel argues—for the first time—that the trial judge erred by sentencing him as a habitual offender because the sentencing orders from his two prior convictions do not establish that the convictions arose "out of separate incidents at different times." Miss. Code Ann. § 99-19-81. Manuel concedes that he failed to raise this issue in the trial court, but he argues that we may address the issue under the plain error doctrine. *See, e.g.*, *Green v. State*, 183 So. 3d 28, 30-31 (¶6) (Miss. 2016). In response, the State filed a motion to supplement the record with the indictments underlying Manuel's two prior convictions. Manuel did not respond to the State's motion, and a panel of this Court

14

granted the motion. *Manuel v. State*, No. 2020-KA-00711-COA (Miss. Ct. App. Mar. 17, 2021) (order). The indictments in the supplemental record show that Manuel's two prior convictions arose from two different drug sales that occurred on different days—one on August 20, 2008, and the other on August 26, 2008. Thus, Manuel's prior convictions clearly arose "out of separate incidents at different times," as required by the statute. *See, e.g.*, *Cook v. State*, 161 So. 3d 1057, 1069-70 (¶¶34-38) (Miss. 2015). Accordingly, the State argues that the trial judge did not commit "plain error" in sentencing Manuel.

¶31.    "Plain-error review is properly utilized for correcting *obvious* instances of injustice or misapplied law." *Green*, 183 So. 3d at 31 (¶6) (quotation marks omitted). "[T]o determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether that error is plain, clear, or obvious, and whether the error has prejudiced the outcome of the trial." *Id.* (quotation marks and brackets omitted). In addition, "[f]or the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Hall v. State*, 201 So. 3d 424, 428 (¶12) (Miss. 2016) (quotation marks and brackets omitted).

¶32.    Interpreting section 99-19-81, the Supreme Court and this Court have held that crimes committed on the same day can satisfy the statutory requirement of "arising out of separate incidents at different times," even if the crimes were committed only minutes apart. For example, in *Pittman v. State*, 570 So. 2d 1205, 1206-07 (Miss. 1990), the Supreme Court held that the defendant was properly sentenced as a habitual offender even though his two

15

prior convictions were for burglaries committed on the same day at two adjacent elementary schools that shared a common walkway, auditorium, and cafeteria. The Court stated that the record was silent as to whether the defendant committed the two burglaries "on one trip to the school 'complex' or two." *Id.* at 1206. But the Court held that even if the defendant committed the two burglaries "as quickly as one could physically accomplish the[] acts, one after the other," they would still be "separate incidents at different times." *Id.* at 1207.

¶33. Similarly, in *Crump v. State*, 288 So. 3d 364, 369-72 (¶¶12-22) (Miss. Ct. App. 2019), this Court held that a defendant's prior convictions for burglary of a business and, on the same day, burglary of a car parked in the business's parking lot arose from "separate incidents at different times." We held that the defendant's crimes against the property of two different persons were "separate" even though they "occurred in close proximity to each other and on the same day." *Id.* at 371 (¶22); *see also Davis v. State*, 850 So. 2d 176, 179-80 (¶¶13-17) (Miss. Ct. App. 2003) (holding that prior convictions for burglary of a dwelling and aggravated assault arose from "separate incidents at different times"—even though the crimes were committed "within minutes of each other," and the defendant was convicted of aggravated assault for firing a gun he took from the dwelling).

¶34. In addition, in *Cook*, the Supreme Court held that the defendant's prior convictions for stealing four-wheelers from different locations on the same day arose from "separate incidents at different times." *Cook*, 161 So. 3d at 1069-70 (¶¶34-38). The Court stated that "[a]lthough the crimes occurred on the same day, [the defendant was] charged in two separate indictments for stealing four-wheelers from two different persons in different

16

locations . . . ." *Id.* at 1070 (¶38).

¶35.   Here, based on the indictments contained in the supplemental record on appeal, Manuel was properly sentenced as a habitual offender.  As noted above, the indictments show that Manuel was separately charged and convicted for two drug sales that occurred several days apart.  Under the precedents discussed above, the two drug sales clearly constitute "separate incidents at different times" for purposes of section 99-19-81.

¶36.   The partial dissent nonetheless argues that we should vacate Manuel's habitual-offender sentence based on this Court's decision in *Floyd v. State*, 155 So. 3d 883, 889-90 (¶¶19-20) (Miss. Ct. App. 2014).  In *Floyd*, the trial court sentenced the defendant as a habitual offender based on a prior sentencing order that showed he previously pled guilty to three counts of transfer of a controlled substance on the same day.  *Id.* at 890 (¶19).  On appeal, this Court held that the trial court erred by sentencing the defendant as a habitual offender because the record did not establish that his three prior convictions arose "out of separate incidents at different times."  *Id.* at (¶20).

¶37.   However, this Court's opinion in *Floyd* is inapposite because it did not apply or even mention the plain-error doctrine.[3]  Moreover, *Floyd* is distinguishable because the

---

[3] The partial dissent notes that a review of the briefs in *Floyd* shows that the State argued the plain-error doctrine applied.  *Ante* at n.6.  In *Floyd*, the State discussed the plain-error doctrine only in its supplemental brief, and even then it devoted only one paragraph to the issue.  More important, this Court's opinion in *Floyd* did not mention, let alone apply, the plain-error doctrine.  Therefore, *Floyd* has no precedential value as a plain-error case. *See, e.g.*, *Alias v. City of Oxford*, 70 So. 3d 1114, 1118 (¶16) (Miss. Ct. App. 2010) ("It is a long-standing legal principle that a decision is not precedent for a legal point if that point is not considered by the reviewing court."); *Johnson v. State*, 44 So. 3d 400, 408 (¶23) (Miss. Ct. App. 2010) ("[I]f a point is not considered by a reviewing court in a previous decision, it is not regarded as precedent[.]").

supplemental record in this case shows that Manuel's two prior convictions clearly satisfy the requirements for sentencing under section 99-19-81. As stated above, under the plain-error doctrine, we will not reverse unless there has "been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Hall*, 201 So. 3d at 428 (¶12) (quotation marks and brackets omitted). Given that Manuel *is* a habitual offender, his habitual-offender sentence is hardly a "miscarriage of justice." Nor does it seriously affect the fairness, integrity, or public reputation of judicial proceedings.

¶38. In support of his plain-error argument, Manuel relies on *Grayer v. State*, 120 So. 3d 964 (Miss. 2013), but *Grayer* is also distinguishable. In *Grayer*, the Supreme Court stated,

> [A]lthough the State informed the circuit court that it had certified copies of Grayer's prior convictions and had provided copies to Grayer and his counsel, [the State] failed to place the certified copies into the record or to offer any evidence to support Grayer's habitual-offender status, other than a recitation of his prior felony convictions. Simply put, the State failed to prove Grayer's prior convictions by competent evidence. Therefore, we find that the circuit court committed error, rising to the level of plain error, by sentencing Grayer as a habitual offender without evidence of his prior convictions.

*Id.* at 969 (¶19). This case is distinguishable from *Grayer* because the State proved Manuel's prior convictions "by competent evidence" that was properly introduced at the sentencing hearing.

¶39. In sum, we hold that Manuel's sentence as a habitual offender is not a manifest miscarriage of justice because the supplemental record shows that Manuel *is* a habitual offender. Therefore, Manuel is not entitled to relief under the plain-error doctrine.

**CONCLUSION**

18

¶40. Manuel fails to show any error or abuse of discretion in any of the trial judge's rulings during trial. In addition, Manuel fails to show that his sentence as a habitual offender constitutes a miscarriage of justice or plain error.

¶41. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, LAWRENCE AND SMITH, JJ., CONCUR. EMFINGER, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD AND McCARTY, JJ., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD AND McCARTY, JJ.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶42. While I agree with the majority's position on all other issues in this case, I disagree with the majority's conclusion that Manuel's habitual-offender sentence pursuant to Mississippi Code Annotated section 99-19-81 (Rev. 2020) fails to constitute a manifest miscarriage of justice that would rise to the level of plain error. Therefore, I respectfully dissent in part.

¶43. Manuel contends that his sentence as a habitual offender pursuant to section 99-19-81 was illegal and unconstitutional because the State failed to prove beyond a reasonable doubt that he had incurred two felony charges "arising out of separate incidents at different times." Miss. Code Ann. § 99-19-81. Defense counsel did not challenge the sufficiency of this proof at trial, but Manuel correctly asserts that this Court may address the issue under the plain-error doctrine to determine whether the court imposed an illegal sentence.

¶44. This Court's review is normally limited to the de novo standard for issues of law, or the abuse of discretion standard for issues of fact. The plain-error doctrine does not give this

19

Court the opportunity to rehear cases at the appellate level any more than it gives the State the opportunity to retry cases at the appellate level. Instead, the plain-error doctrine is designed to open up our limited standard of review to prevent injustice from being used as a means to achieve a legally acceptable end. The doctrine allows this Court to correct prejudicial errors, to prevent miscarriages of justice, to protect fundamental rights and the integrity of the court system, and to assure fairness. *Swinney v. State*, 241 So. 3d 599, 605 (¶14) (Miss. 2018); *Hall v. State*, 201 So. 3d 424, 428 (¶12) (Miss. 2016); *Grayer v. State*, 120 So. 3d 964, 969 (¶15) (Miss. 2013). The doctrine allows us to reach beyond the review for abuse of discretion to correct "obvious" error. *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016).

¶45. The Mississippi Supreme Court has explained that "[t]he plain error doctrine is employed only in situations when a defendant's substantive or fundamental rights are affected." *Swinney*, 241 So. 3d at 605 (¶14) (quoting *Green*, 183 So. 3d at 31 (¶6)). "Plain-error review is properly utilized for correcting obvious instances of injustice or misapplied law." *Id*. Our Supreme Court specifically found that a defendant's argument that the State failed to prove his habitual-offender status with competent evidence was reviewable for plain error. *Grayer*, 120 So. 3d at 969 (¶16). The *Grayer* court set forth the following test for plain-error review: "To determine if plain error has occurred, this Court must determine 'if the trial court has deviated from a legal rule, whether that error is plain, clear[,] or obvious, and whether that error has prejudiced the outcome of the trial.'" *Id*. at (¶15) (quoting *Lafayette v. State*, 90 So. 3d 1215, 1220 (¶18) (Miss. 2012)).

20

## I.    Deviation from a Legal Rule

¶46.    We must first look to the statute and burden of proof to determine whether the trial court deviated from a legal rule. Section 99-19-81 provides in part, as it did in early 2015:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and *arising out of separate incidents* at *different times* and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony . . . .

(Emphasis added).

¶47.    A further breakdown of the pertinent statutory elements of section 99-19-81 is as follows: (1) A person (2) convicted of a felony (3) in Mississippi (4) who was twice previously convicted (5) of any felony, state or federal, (6) upon charges separately brought and (7) arising out of separate incidents at different times, (8) with each sentence being for a separate term of one year or more (9) in any state and/or federal penal institution. The statutory element at issue is whether the previous convictions were ones "arising out of separate incidents at different times." Our Supreme Court has provided the following valuable guidance for the analysis of this element:

> Our problem is that the text does not tell us how distant in time the prior criminal acts must be.
>
> . . . .
>
> But before such behavior should be labeled habitual, it would seem that the events should be *sufficiently separate that the offender's criminal passions may have cooled* so that he has time to reflect, and if after such an interval the individual forms and actualizes a new criminal design, and then does so a third time, he should be met with all of the power of the public force. Conversely,

21

*two offenses committed in rapid succession* do not suggest the same repetitiveness of criminal design such that the offender may be thought predictably habitual thereafter, or deserving of severe sanction.

*Pittman v. State*, 570 So. 2d 1205, 1206 (Miss. 1990) (emphasis added); *accord Crump v. State*, 288 So. 3d 364, 370 (¶15) (Miss. Ct. App. 2019). The majority cites *Pittman* and *Crump* to support the premise that crimes in close temporal proximity can be used to support a finding under this element, but the majority ignores the guidance quoted above.[4]

¶48. Procedurally, habitual offenders receive bifurcated trials to determine whether they qualify for an enhanced penalty. *Seely v. State*, 451 So. 2d 213, 214 (Miss. 1984). At the sentencing portion of the trial, "the circuit judge is to . . . determin[e] whether the habitual offender part of the indictment is established by the requisite degree of proof." *Conner v. State*, 138 So. 3d 143, 151 (¶20) (Miss. 2014). The State has the burden of proving the elements in the applicable habitual-offender statute, and the elements must be proved beyond a reasonable doubt. *Id.* at (¶¶20-21). "[T]he state has the same burden of proof as to the habitual offender portion of the indictment as it has on the principal charge." *Id*. at (¶21) (quoting *Young v. State*, 507 So. 2d 48, 50 (Miss. 1987)). "The defendant has the same rights at the habitual-offender sentencing hearing as at trial." *Id*. The Supreme Court emphasized that "a bifurcated trial means a full two-phase trial prior to any finding that the defendant is

---

[4] Specifically, *Crump* (citing *Pittman*) observes, "In order for an offender's criminal activity to be labeled habitual, 'the events should be sufficiently separate that the offender's criminal passions may have cooled so that he has time to reflect, and if after such an interval the individual forms and actualizes a new criminal design'"—which is exactly what the State failed to do in this case. *Crump*, 288 So. 3d at 370 (¶15) (quoting *Pittman*, 570 So. 2d at 1206). Additionally, "Pittman correctly reminds us that the prosecution bore the burden of proving each element of his habitual offender status beyond a reasonable doubt, the same as at any criminal proceeding." *Pittman*, 570 So. 2d at 1206.

22

[a] habitual offender and subject to enhanced punishment." *Id.*

¶49. To determine if there was a deviation from the rule, we must determine whether the State presented sufficient evidence at the sentencing hearing to show that Manuel was a habitual offender under section 99-19-81. *Brown v. State,* 217 So. 3d 805, 807 (¶5) (Miss. Ct. App. 2017) ("The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). Our Supreme Court has observed that "there appears to be some tendency to routinely allow the State to produce some documentation of prior offenses and for the trial court to perfunctorily find the defendant [a] habitual offender, then routinely pass out the sentence mandated . . . ." *Seely*, 451 So. 2d at 215. Our Supreme Court is adamant that the sentencing portion of the habitual-offender status hearing should not be deficient and that a full two-phase trial should occur. *See Young*, 507 So. 2d at 50 (holding that no true two-phase trial occurred when the State produced documents at the sentencing phase without the proper foundation, declaring "Certainly, no two-phase trial occurred. The state simply introduced the documents to prove prior convictions, and that was that. This is the epitome of the evil against which the *Seely* court protested.").

¶50. At Manuel's sentencing proceedings, the State presented the trial court with two certified copies of prior sentencing orders, which were marked and received into evidence. As the trial court struggled to tell the documents apart, the following exchange ensued:

> THE COURT:     All right. Do you have any -- what I'm looking at is -- it looks like two pages of the same document. Am I

23

looking at that wrong?

Mr. McNAMARA: Your Honor, one is labeled as 08-1180 and one is 08-1181.

THE COURT: All right. Hold on a second. I'm going to hand these back to you. Are you telling me that these documents are not identical to one another? Show me -- tell me what you're talking about.

Mr. McNAMARA: Yes, Your Honor. In the -- the cause number –

THE COURT: Yeah.

Mr. McNAMARA: -- this one is 08-1180. The cause number in the second is 08-1181.

THE COURT: Okay. All right. Very well. Okay. I see. Do you have anything further?

Mr. McNAMARA: No, Your Honor, other than the fact that I believe that we've presented evidence that shows that he has been charged with two different felonies arising out of separate charges, separate times, and sentenced to a term of one year or more. That would be all, Your Honor.

¶51. It is true that "sentencing orders are competent evidence of previous convictions." *Harper v. State*, 887 So. 2d 817, 828 (¶49) (Miss. Ct. App. 2004) (citing *Duplantis v. State*, 708 So. 2d 1327, 1347 (¶101) (Miss. 1998)). Even so, an analysis of cases in which sentencing orders are used as evidence of prior crimes to prove habitual-offender status reveals that sentencing orders typically have different dates and are supplemented with additional documents, such as indictments. This makes clear to the trial court that the charges arose out of separate incidents at different times. *See Moore v. State*, 631 So. 2d 805, 806 (Miss. 1994) (holding that copies of indictments and sentencing orders with

24

separate dates are sufficient); *Heidelberg v. State*, 45 So. 3d 730, 733 (¶13) (Miss. Ct. App. 2010) (holding that sentencing orders depicting a defendant's convictions for different crimes listed in different years are admissible as evidence); *accord Brown*, 217 So. 3d at 807 (¶7) (holding that three sentencing orders were insufficient proof that a defendant actually *served* over one year for his convictions under the violent habitual-offender statute).

¶52.    A further survey of cases specifically analyzing the statutory language "separate incidents at different times" shows that there is always *some* evidence provided to show the crimes were indeed separate incidents at different times. *See Cook v. State,* 161 So. 3d 1057, 1070 (¶¶37-38) (Miss. 2015) (holding prior crimes as separate incidents at different times when the record showed prior indictments proved that a grand larceny charge, while committed on the same date, was at a different location and committed against a different victim); *Burt v. State*, 493 So. 2d 1325, 1329 (Miss. 1986) (holding as separate crimes two felony convictions proved by indictments showing different dates for prior burglary offenses, as well as two different dwellings and victims, even though the date of the conviction was the same); *Jones v. State*, 304 So. 3d 702, 705 (¶¶6-7, 10) (Miss. Ct. App. 2020) (finding charges were sufficiently separate and distinct when both offenses occurred on the same date, but the record showed the State proffered indictments and sentencing orders describing grand larceny and burglary of two different automobiles, presumably with different two different victims); *Davis v. State*, 850 So. 2d 176, 179-80 (¶¶14, 16-17) (Miss. Ct. App. 2003) (holding two crimes—a burglary followed by an aggravated assault—arose from separate incidents because although the crimes were close together in time, the latter offense was

25

committed against a different victim).

¶53. A review of the sentencing orders offered in Manuel's trial court proceedings, as well as a review of his indictment as a habitual offender, shows that there is no mention of the date, location, or a description of the two crimes. The indictment describes the crimes as follows:

> [T]he said Lorenzo Manuel, having been previously convicted of at least two felonies, to-wit: the crime of sale of hydrocodone in the Circuit Court of the First Judicial District of Hinds County, Mississippi, on 03-02-2009, in Cause number 08-1-180-01 in said Court, and the crime of sale [of] hydrocodone in the Circuit Court of the First Judicial District of Hinds County, Mississippi, on 03-02-2009, in cause number 08-1-181-01 in said Court, each of said felony convictions being upon charges separately brought and arising out of separate incidents at different times . . . .

The sentencing orders are similarly short of facts surrounding the incidents. All the information, including the charge, sentence, and sentencing date, is identical except for the cause number.

¶54. On the whole, it appears the State need not provide *much* in the way of evidence that the crimes arose out of separate incidents at different times. The majority points to *Pittman*, where burglaries of neighboring Dotson and Wilson Elementary Schools were found to be separate incidents under the habitual-offender statute when they were committed on the same night.[5] *Pittman*, 570 So. 2d at 1206-07. Similarly in *Crump*, another case the majority cites, the defendant's convictions of burglary of two entities in the same day—a car owned by one victim and a business owned by another—were upheld under the habitual-offender statute.

---

[5] Notably, the record is silent on whether the offenses were committed on one trip to the school "complex" or two. *Pittman*, 570 So. 2d at 1206.

26

*Crump*, 288 So. 3d at 370-72 (¶¶15-22). I do not suggest that crimes committed in close proximity in time cannot be used for habitual offender sentencing, as "the statute's language offers no bright-line rule as to how distant in time the prior criminal acts must be." *Id*. at 370 (¶15) (internal quotation marks omitted). However, these cases are easily distinguishable from Manuel's case. In *Pittman*, *Crump*, and each of the additional cases we surveyed, the "separate incidents" could be distinguished and established because the State had provided adequate information to show different dates, different victims, or a sufficient lapse in time between the crimes for an offender's criminal passions to cool. In the present case, there is a glaring absence in the record of such facts. In Manuel's case the State provided *no* evidence during the sentencing phase of the trial to prove the statutory element that these convictions were ones "arising out of separate incidents at different times," aside from different cause numbers.

¶55. The State must provide *some* evidence that establishes each element of the statute beyond a reasonable doubt, including the requirement that the prior crimes "ar[ose] out of separate incidents at different times." Miss. Code Ann. § 99-19-81. In the present case, the sentencing orders indisputably proved the existence of the prior crimes beyond a reasonable doubt. However, it is apparent from the record that the prosecution deviated from the legal standard when it did not prove the essential statutory element of "separate incidents at different times" beyond a reasonable doubt. *Id*. Thus, this prong of the plain-error-review inquiry is met.

II.     **Plain, Clear, or Obvious Error**

27

¶56.	Next, we must determine "whether that error is plain, clear[,] or obvious." *Grayer*, 120 So. 3d at 969 (¶15). Here the error is "plain, clear, or obvious" because the trial court's actions contradict this Court's prior ruling in a nearly identical case. In *Floyd v. State*, 155 So. 3d 883, 890 (¶19) (Miss. Ct. App. 2014), the State produced to the trial court a prior order from the Harrison County Circuit Court that recorded Floyd's guilty plea to three charges as evidence to establish Floyd's habitual-offender status. As in the present case, the charges described were indistinguishable except for their cause numbers, with the order stating that Floyd was found guilty of "transfer of a controlled substance in B24019800717 and transfer of a controlled substance—2 cts. in B24019800865." *Id.* The record also included a second order revoking probation and ordering Floyd to serve three concurrent sentences. *Id.* Under plain error review,[6] this Court held these orders were not enough because "[t]he record does not include any further information on these three charges, as required by section 99-19-81—whether they constitute at least two prior charges separately brought and arising out of separate incidents at different times." *Id.* at (¶20) (internal quotation marks omitted). This Court concluded by cautioning against the perfunctory

_____

[6] *Floyd*'s precedential value is in its set of nearly identical facts. On these similar facts, this Court relied on Supreme Court holdings and reached a different holding than the majority opinion in the present case. Although the *Floyd* court did not mention plain-error review in its opinion, Floyd did not object at the trial level to the State's evidence for his adjudication as a habitual offender, which the State pointed out in its appellee's brief. The result is that plain-error review was the *only* avenue for review of this issue, as the State indicated in its supplemental appellate briefing. *See* MRE 103(f). Because it is implausible that this Court did not use plain-error review under these circumstances, as the majority suggests, this case is of enormous precedential value. We may take judicial notice of Court of Appeals' files. *Crawford v. Fisher*, 213 So. 3d 44, 47 (¶10) (Miss. 2016). We take judicial notice that there was no contemporaneous objection to this issue in *Floyd*, and thus the issue was only reviewable for plain error as described in the State's briefs.

finding of defendants as habitual offenders. *Id*. (citing *Young*, 507 So. 2d at 50). This Court subsequently vacated Floyd's sentence, holding that the State "failed to follow the statutory requirements to prove his habitual offender status." *Id*. at (¶21). Floyd's case was remanded for re-sentencing with the understanding that "the State [was] not entitled to a second chance to prove the defendant's habitual-offender status on remand." *Id*. Given this case, as well as the "obvious" understanding that each element of the habitual offender statute must be met, it is clear that the error by the trial court was "plain, clear[,] or obvious." *Brown,* 217 So. 3d at 807 (¶5); *Grayer*, 120 So. 3d at 969 (¶15). Therefore this prong of plain error review is also met.

### III.    Error that Prejudiced the Outcome of the Trial

¶57.    This court must also determine "whether that error has prejudiced the outcome of the trial." *Id*. "Generally, an illegal sentence causes the defendant prejudice." *Edwards v. State*, 839 So. 2d 578, 580 (¶8) (Miss. Ct. App. 2003) (citing *Robinson v. State*, 836 So. 2d 747, 748 (¶¶3-5) (Miss. 2002)). "[A]n illegal sentence is one that 'does not conform to the applicable penalty statute.'" *Grayer*, 120 So. 3d at 969 (¶16) (quoting *Foreman v. State*, 51 So. 3d 957, 962 (¶22) (Miss. 2011)). Furthermore, the United States Supreme Court has analyzed an error for its effect on a defendant's "substantial rights" while acknowledging that the inquiry of whether error has a serious effect on "the fairness, integrity[,] or public reputation of judicial proceedings" is "independent of the defendant's innocence." *United States v. Olano*, 507 U.S. 725, 736-37 (1993). *Olano* is one example of how the United States Supreme Court does not view plain error with an eye to the end result. As discussed

29

above, it is clear that the State's evidence fell short and did not conform to the statute at the trial when sentencing Manuel as a habitual offender, making his sentence illegal and thus prejudicial. Given this insufficiency and the foregoing cases, obvious error is present that prejudiced the outcome of the trial, and thus this prong is met as well.

## IV. Substantive or Fundamental Rights and the Integrity of the Judicial System

¶58. Finally, we must assess whether a fundamental right has been injured, because "[t]he plain error doctrine is employed only in situations when a defendant's substantive or fundamental rights are affected." *Swinney*, 241 So. 3d at 605 (¶14). Additionally, plain-error review is used to protect "the integrity of the court system . . . and to assure fairness." *Grayer*, 120 So. 3d at 969 (¶15). "Just as providing proper jury instructions and correctly weighing evidence affect fundamental rights, basing a sentence enhancement on insufficient evidence [also] affects an individual's fundamental rights." *Williams v. State*, 794 So. 2d 181, 188 (¶¶28-29) (Miss. 2001) (reversing judgment and remanding for re-sentencing after finding plain error), *overruled on other grounds by Brown v. State*, 955 So. 2d 698, 703 (¶19-20) (Miss. 2008). "An accused has a fundamental right to be free of an illegal sentence." *Grayer*, 120 So. 3d at 969 (¶16).

¶59. After Manuel appealed his habitual-offender sentence, the State supplemented the appellate court record with indictments for Manuel's prior offenses per this Court's March 17, 2021 order. The indictments do in fact list two separate dates for the crimes used to determine Manuel's habitual-offender status. This is the evidence that should have been provided at Manuel's trial court sentencing hearing. The majority improperly points to the

30

indictments that the State provided to the appellate court as sufficient to satisfy the statutory requirements for sentencing under section 99-19-81. Since the indictments supplied to the appellate court indicate that Manuel was indeed eligible to be sentenced as a habitual offender, the majority posits that his sentence enhancement was not a "manifest miscarriage of justice." The majority would have this Court review plain error with an eye toward the end result instead of adhering to our role of reviewing the actions of the trial court for error.

¶60. In *Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018), the United States Supreme Court addressed the same stance the majority takes when an inmate was sentenced to a longer-than-necessary sentence based on an error in calculating the petitioner's sentencing guidelines. *Id*. at 1905. The United States argued that in the end, the incorrect sentence still fell within the Federal Sentencing Guidelines range and was presumptively reasonable. *Id*. at 1910. The United States Supreme Court, however, determined that the *end result does not justify the error that the trial court made*, stating that "[b]efore a court of appeals can consider the substantive reasonableness of a sentence, '[i]t must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range.'" *Id.* at 1910 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). "This makes eminent sense, for the district court is charged in the first instance with determining whether, taking all sentencing factors into consideration, . . . a sentence is 'sufficient, but not greater than necessary.'" *Id*. (quoting 18 U.S.C. § 3553). The Supreme Court reasoned that "*regardless of its ultimate reasonableness*, a sentence that lacks reliability because of unjust procedures may well undermine public perception of the

proceedings. . . . [T]he mere fact that Rosales-Mireles' sentence falls within the corrected Guidelines range does not preserve the fairness, integrity, or public reputation of the proceedings." *Id.* (citations omitted) (emphasis added).

¶61.    In the present case, the majority repeats the circuit court's error from *Rosales-Mireles*. It fails to contemplate that this Court is designed to correct errors at the trial level, not to give the State a second chance to try the case on appeal.  Few things would more seriously affect the fairness, integrity, or public reputation of judicial proceedings than to allow the State to essentially retry cases for which it provided insufficient evidence at trial by supplying the appellate court with additional evidence.  Furthermore, to let such a ruling by the trial court stand would be tantamount to ratifying the State's ineptitude with regard to its duty to prove each element of the statute beyond a reasonable doubt at the trial level.  Since these indictments were not provided at the trial court level, they should not be taken into consideration by this Court when reviewing the trial court's error in sentencing Manuel as a habitual offender.

¶62.    It is difficult to imagine a more "obvious" miscarriage of justice and threat to the integrity of the court system and Manuel's fundamental rights than the present case. Manuel's habitual-offender status, while not impacting his sentence for second-degree murder under Mississippi Code Annotated section 97-3-21 (Rev. 2014),[7] seriously impacts his consecutive sentence for aggravated assault under Mississippi Code Annotated section

---

[7] "No person sentenced for . . . [m]urder in the second degree, as defined in Section 97-3-19 [on or after June 30, 1995], shall be eligible for parole[.]" Miss. Code Ann. § 47-7-3(1)(d) (Supp. 2021).

97-3-7 (Rev. 2014). A habitual offender is not eligible for the earned-time allowance. Miss. Code Ann. § 47-5-139(1)(b) (Rev. 2015). A habitual offender is not eligible for parole. *Id*. § 47-7-3(1)(a) (Supp. 2014). A habitual offender is not eligible for early release. *See id*. § 47-7-3.2(2)(b) (Supp. 2014). A habitual offender is not eligible for geriatric parole. *Id*. § 47-7-3(h)(iii)(1) (Supp. 2021). Manuel's conviction for aggravated assault under section 97-3-7, as one of the violent offenses specifically listed in Mississippi Code Annotated section 97-3-2 (Rev. 2014), falls squarely within the list of crimes now eligible for parole "after having served fifty percent (50%) or twenty (20) years, whichever is less, of the sentence . . . ." *Id*. § 47-7-3(h)(i)(2) (Supp. 2021). The improper application of the habitual-offender enhancement to Manuel's aggravated-assault sentence will prevent his ability to apply for these reductions in his sentences when the time comes. Because of the foregoing, it is apparent that Manuel's fundamental rights were impacted, and the error is one that affects the "fairness, integrity[,] or public reputation of judicial proceedings." *Hall*, 201 So. 3d at 428 (¶12). Thus, this final requirement for plain-error review is fulfilled.

## CONCLUSION

¶63. It is simply impossible to say that someone who received a harsher sentence as a habitual offender based on insufficient evidence is fair. The majority's opinion suggests that the ends justify the means since Manuel *would have been found* to be a habitual offender had the State fulfilled its burden at the trial level to prove the elements of the habitual-offender enhancement beyond a reasonable doubt. This is not so under our system of justice. The means of how we dispense justice at the trial level are equally important, if not more

33

important, than the final result reached by our judicial system. Because the State deviated from the appropriate legal rule in Manuel's case, the error is plain and obvious; the error created prejudice by producing an illegal sentence, and because the error affected a fundamental right by basing a sentencing enhancement on insufficient evidence, the sentences here call for reversal within the scope of plain-error review. *Grayer*, 120 So. 3d at 969 (¶15).

¶64. For the foregoing reasons, I believe that the circuit court committed plain error in Manuel's case by failing to have sufficient evidence to find that Manuel's prior convictions arose out of separate incidents at different times. Given this, I dissent under the belief that the habitual-offender portions of Manuel's sentences should be reversed and vacated.

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**